UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development, <br><br> Defendants. | Civil Action No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiffs Massachusetts Fair Housing Center ("MFHC") and Housing Works, Inc.

("Housing Works") seek a declaratory judgment and injunctive relief vacating a new rule

promulgated by the Department of Housing and Urban Development ("HUD"), *Implementation*

*of the Fair Housing Act's Disparate Impact Standard*, 85 Fed. Reg. 60288 (September 24, 2020)

(the "2020 Rule").  The 2020 Rule, as it would be codified in 24 C.F.R. §§ 100.5 and 100.500 on

October 26, 2020 (when the 2020 Rule is set to take effect), is attached as Exhibit A.

2.      The 2020 Rule undermines the ability of victims of housing and mortgage lending

discrimination to pursue disparate impact claims under the Fair Housing Act, 42 U.S.C. §§ 3601

*et seq*. (the "FHA"), by introducing novel pleading and proof requirements that will be virtually

impossible to meet, and creating broad new defenses to liability, contrary to the language and

intent of the FHA and decades of practice, both at HUD and in the courts.

3.      The ability to bring disparate impact claims to root out and eliminate subtle, disguised or ignorant discrimination on the basis of race, color, religion, sex, disability, familial status or national origin is central to the FHA's structure and purpose to eradicate systemic housing discrimination and create inclusive communities.

4.      If the 2020 Rule is allowed to take effect, the vitally important remedial purposes of the FHA will be seriously undermined.  Victims of housing and lending discrimination will face unreasonably high barriers, erected by HUD to deter the pursuit of valid disparate housing claims, and fair housing advocates such as the Plaintiffs will be stripped of an essential tool they have relied on for decades in the continuing fight against segregated housing.

5.      By making it nearly impossible for a victim of housing or lending discrimination to plead and prove their case, the 2020 Rule will allow perpetrators of housing and lending discrimination to act with impunity, defeating the central goal of the FHA.

6.      The Court should issue a preliminary injunction, extending the effective date of the 2020 Rule during the pendency of this review proceeding, and then declare the 2020 Rule to be unlawful, and set it aside under the Administrative Procedure Act (the "APA"), to prevent irreparable harm and provide complete, uniform and fair protection to the Plaintiffs and similar organizations, and the victims of housing and lending discrimination they represent.

## PARTIES

### Plaintiffs

**Massachusetts Fair Housing Center**

7.      Massachusetts Fair Housing Center is a non-profit, charitable corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 57 Suffolk Street, Fourth Floor, Holyoke, Massachusetts.

8.      MFHC is a full-service fair housing organization dedicated to eliminating systemic housing discrimination and creating inclusive communities in the Commonwealth of Massachusetts.  Founded in 1989, MFHC has been continuously operating for over thirty years, with a service area that includes Worcester, Franklin, Hampshire, Hampden and Berkshire Counties.

9.      MFHC provides free legal services, conducts housing discrimination testing, and accepts housing discrimination complaints based on race, national origin, color, ancestry, religion, sex, disability, presence of minor children, sexual orientation, gender identity and expression, age, marital status, military or veteran status, receipt of public assistance, including Section 8 housing assistance, receipt of housing subsidies, or rental assistance, and genetic information.

10.     MFHC accepts over 300 housing discrimination complaints per year, and has recovered hundreds of thousands of dollars in damages and extensive injunctive relief for victims of housing discrimination.

11.     In addition to its legal work, MFHC provides extensive education and outreach services on issues of fair housing and fair lending.

12.     MFHC provides training in fair housing to community groups, healthcare providers, tenants, landlords, property managers, realtors, first-time home buyers, and others. MFHC's trainings focus largely on educating the public about their rights under the FHA and state anti-discrimination law and educating housing professionals about their obligations under these laws.  MFHC has expended resources in preparing training materials and training its own staff in the legal standards applicable to FHA cases in order to provide this education.

13.     MFHC also advocates for local, state and federal policy changes to end systemic discrimination and promote housing choice.

14.     MFHC's legal, education, and advocacy efforts have resulted in changes in behavior in the landlord and realtor communities in Massachusetts.

15.     HUD has for many years recognized that as an organization with experience providing quality fair housing enforcement activities, MFHC is eligible under HUD's Fair Housing Initiatives Program ("FHIP") for grants to carry out testing and enforcement activities to prevent or eliminate discriminatory housing practices.

16.     HUD has also consistently acknowledged MFHC's standing to bring charges of discriminatory housing practices under the FHA, most recently in *MFHC v. Kamins of Amherst, Inc., et al*., FHEO No. 01-19-2559-8 (September 11, 2020), and *MFHC v. Bernashe Realty, Inc., et al.,* FHEO No. 01-18-8950-8 (August 7, 2018).  In both of these cases, HUD recognized MFHC as an "aggrieved person" within the meaning of the FHA and HUD's regulations. 42 U.S.C. § 3602(i); 24 C.F.R. § 100.20.

**Housing Works, Inc.**

17.     Housing Works, Inc. is a not-for-profit corporation organized under the laws of the State of New York with a principal place of business at 57 Willoughby St., Brooklyn, New York.

18.     Housing Works is a healing community of people living with and affected by HIV/AIDS whose mission is to end the dual crises of homelessness and AIDS.  Housing Works is deeply committed to ensuring fair and affordable housing for marginalized, indigent, and low-income communities.  Founded in 1990, Housing Works provides a comprehensive array of services to more than 30,000 homeless and low-income New Yorkers living with and affected by HIV/AIDS.

19.     Housing Works provides advocacy and comprehensive services to forward its mission, including legal services to help clients obtain housing and challenge discriminatory housing policies and practices.

20.     Through its advocacy offices in New York City, Albany, New York, Washington, D.C., Puerto Rico and Haiti, Housing Works fights for funding and legislation to ensure that all people living with HIV/AIDS have access to quality housing, healthcare, HIV prevention information and other life-sustaining services, as well as legal protections from discrimination.

21.     Housing Works also provides supportive services including housing, healthcare, meals and nutritional counseling, mental health and substance use treatment, job training, and legal assistance.

22.     As part of its housing services, Housing Works operates twelve residences to provide housing to eligible individuals living with HIV; people of transgender experience living with HIV; single men and women with active substance abuse issues; HIV-positive single women recently released from a correctional setting; HIV-positive unstably housed LGBTQ youth; and families where the head-of-household is living with HIV.

23.     Housing Works also provides free legal services to help clients obtain housing, through the Housing Works Legal Department and the HIV Law Project.

24.     For over two decades, Housing Works' Legal Department has successfully prosecuted impact litigation on issues involving HIV/AIDS, homelessness, public benefits, and disability, housing and gender discrimination.  Housing Works has been at the forefront of challenging source of income and disability discrimination in New York City's housing market.

25.     Prosecuting disparate impact claims under the FHA, Housing Works has secured seminal legal decisions and successfully settled numerous cases against some of the largest

landlords in New York and around the country on behalf of New Yorkers living with HIV/AIDS who rely upon public subsidies to secure and maintain their housing.

**The 2020 Rule's Impact on the Plaintiffs**

26.     The 2020 Rule will frustrate the Plaintiffs' ability to fulfill their missions of eradicating systemic housing discrimination and creating inclusive communities because the 2020 Rule arbitrarily raises the pleading standards and proof requirements plaintiffs must meet to bring disparate impact claims, a critical tool for providing legal relief and redress to victims of housing and lending discrimination.

27.     The 2020 Rule's heightened pleading and proof requirements, as well as the novel defenses it creates, are intended to, and will, deter victims of housing or lending discrimination from working with the Plaintiffs to bring cases based on disparate impacts because of the vast amount of information victims must seek to gather at the outset of a case in order to meet the new pleading standards, including information that is likely to be in the exclusive possession of potential defendants who may not be subject to pretrial discovery or public records laws.

28.     The 2020 Rule will require the Plaintiffs to divert resources from their existing programs to provide the assistance needed to meet the 2020 Rule's improperly heightened pleading and proof requirements.

29.     The 2020 Rule will require the Plaintiffs to abandon cases and claims in development, on which the Plaintiffs had already expended time and resources, which would have previously been viable under the 2013 Rule, but are now made prohibitively more challenging by the new 2020 Rule.

30.     The 2020 Rule undermines the important remedial purpose of recognizing disparate impact liability and will thwart the Plaintiffs' ability to advocate that property owners,

local land use officials, and lenders adhere to nondiscriminatory practices because they may no longer fear liability—or even scrutiny—under the FHA.

31.     The 2020 Rule will undermine the Plaintiffs' ability to pursue disparate impact claims not only to address individual cases of housing discrimination, but also to change patterns of behavior that lead to disparate impacts on many members of protected classes.

32.     The 2020 Rule will require the Plaintiffs to expend significant resources to reeducate victims of housing and lending discrimination on their rights under the FHA, and to assure them that they are still protected under the FHA, notwithstanding the 2020 Rule's heightened pleading and proof standards which are designed to deter them from vindicating their rights.

33.     The 2020 Rule will require the Plaintiffs to expend significant time and resources to train staff members and prepare new training materials for public outreach.  The Plaintiffs will have to divert resources and time that would otherwise have been available for other critically-important programming, all in the middle of a pandemic that already strains the resources of organizations at the frontlines of fighting housing insecurity.

34.     The 2020 Rule will increase the demand for the Plaintiffs' services, because the 2020 Rule will dilute the FHA's deterrent effect on discriminatory behavior in housing and lending, but at the same time the 2020 Rule will make it far more difficult for the Plaintiffs to provide relief to the clients they serve.

### Defendants

35.     Defendant U.S. Department of Housing and Urban Development is a department of the Executive Branch of the United States Government.  HUD published the 2020 Rule in the Federal Register on September 24, 2020.

36.     Defendant Ben Carson is the Secretary of HUD and is responsible for overseeing all HUD operations, including the promulgation of regulations, the development and implementation of programs, and compliance with and enforcement of governing statutes, including the FHA.  Secretary Carson is sued in his official capacity.

37.     HUD and Secretary Carson have a statutory obligation to affirmatively further fair housing.  42 U.S.C. §§ 3608(d) & (e)(5).

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331, 5 U.S.C. §§ 702 & 703, and 28 U.S.C. § 2201.

39.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff MFHC has its principal place of business in Holyoke, Massachusetts.

## FACTS

### The Pursuit of Disparate Impact Claims is Essential to Fulfilling the Goals of the FHA

40.     Passed in 1968, seven days after the assassination of Dr. Martin Luther King, Jr., the purpose of the FHA is to prohibit and eradicate entrenched racial segregation and exclusion in housing and related services such as mortgage lending.

41.     The FHA is a fitting tribute to Dr. King, who devoted the final years of his life to ending segregation in housing.  In March 1965, approximately one year before the FHA was signed into law, Dr. King gave a speech on the steps of the Alabama State Capitol at the end of the march from Selma to Montgomery, calling for an end to segregated housing "until every ghetto or social and economic depression dissolves, and Negroes and whites live side by side in decent, safe, and sanitary housing."[1]

---

[1]     Dr. Martin Luther King, Jr., Address at the Conclusion of the Selma to Montgomery March (Mar. 25, 1965), https://kinginstitute.stanford.edu/king-papers/documents/address-conclusion-selma-montgomery-march.

42.     Dr. King was not alone in his efforts.  One month prior to the enactment of the FHA, a commission chaired by Illinois Governor Otto Kerner, Jr. released a report documenting the cause of protests that had swept the country in the prior summer (the "Kerner Report").[2]  The Kerner Report sounded the alarm that America was moving toward two "separate and unequal societies"—one Black and one white.[3]  The report found that white racism was "essentially responsible for the explosive mixture which has been accumulating in our cities since the end of World War II."[4]  The "ingredients of this mixture" included "pervasive discrimination and segregation" in housing, which the report found had "resulted in the continuing exclusion of great numbers of Negroes from the benefits of economic progress."[5]  The Kerner Report concluded with a recommendation that Congress pass a "comprehensive and enforceable open housing law" to address the problem.[6]

43.     Courts have understood and enforced the FHA in light of its historical roots.  As the United States District Court for the District of Columbia recently observed, the FHA "was, in large part, a response to the heightened racial tensions and riots erupting in the United States throughout the 1960s, and the FHA's passage reflected an understanding that 'fair housing legislation' was 'the best way for Congress' at that time 'to start on the true road to integration.'" *National Fair Housing All. v. Carson*, 330 F. Supp. 2d 14, 24 (D.D.C. 2018).

---

[2]     NAT'L ADVISORY COMM'N OF CIVIL DISORDERS, REPORT OF THE U.S. NAT'L ADVISORY COMMISSION ON CIVIL DISORDERS (1968), https://www.ncjrs.gov/pdffiles1/Digitization/8073NCJRS.pdf.

[3]     *Id.* at 5.

[4]     *Id.*

[5]     *Id.*

[6]     *Id.* at 13.

44.     As a remedial statute, the FHA is designed to provide broad and powerful

protections from housing discrimination on the basis of race, color, religion, sex, disability,

familial status, or national origin, and to provide ready access to and redress at HUD and in the

courts when discrimination does occur.

45.     The FHA makes it the policy of the United States to support the development and

maintenance of diverse and inclusive neighborhoods by guaranteeing fair housing for all.

46.     Until very recently, HUD understood and acknowledged its long-standing

statutory mandate under the FHA to "affirmatively further fair housing" by "taking meaningful

actions, in addition to combating discrimination, that . . . foster inclusive communities free from

barriers that restrict access to opportunity based on protected characteristics." *Affirmatively*

*Furthering Fair Housing*, 80 Fed. Reg. 42272, 42353 (July 16, 2015) (defining "affirmatively

further fair housing" in 24 C.F.R. § 5.152, rescinded in its entirety by HUD effective August 7,

2020).

47.     By 1998, when Congress revisited and strengthened the FHA through the Fair

Housing Amendments Act of 1988 (the "FHAA"), every federal Court of Appeals that had

considered the issue had concluded that a plaintiff may prevail on a housing or lending

discrimination claim under the FHA by demonstrating discriminatory intent or, alternatively, by

showing that the challenged practice actually or predictably results in racial discrimination — in

other words, that it has a discriminatory effect or "disparate impact."

48.     By that time, courts had arrived at a consistent understanding as to the pleading

standards and shifting burdens of proof in disparate impact cases, drawing upon their experience

adjudicating claims under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et*

*seq.*, the FHA's sister statute in employment.

49.     When it enacted the FHAA in 1988, Congress accepted and ratified the approach

HUD and the courts had taken in disparate impact cases under the FHA and expressly rejected a

proposed amendment that would have eliminated disparate impact liability for certain zoning

decisions.

50.     In 2015, the Supreme Court unequivocally affirmed that the FHA prohibits both

intentional discrimination and acts with unjustified disparate impacts that create "separate and

unequal" conditions.  *Texas Department of Housing and Community Affairs v. Inclusive

Communities Project*, 576 U.S. 519, 546 (2015) ("*Inclusive Communities*").  The Supreme Court

underscored that "[r]ecognition of disparate-impact claims is consistent with the FHA's central

purpose" and that disparate impact liability is necessary to "counteract unconscious prejudices

and disguised animus that escape easy classification as disparate treatment."  *Id.* at 521.  The

Court based its analysis on the text of the FHA, overwhelming appellate court precedent

endorsing such an interpretation, and the 1988 enactment of the Fair Housing Amendments Act,

which strengthened the FHA and ratified this understanding.  *Id*. at 534.

51.     The Supreme Court explained the central role disparate impact cases play in FHA

enforcement, noting that, all too often, "zoning laws and other housing restrictions . . . function

unfairly to exclude minorities from certain neighborhoods without any sufficient justification,"

and that suits "targeting such practices reside at the heartland of disparate-impact liability."  *Id*. at

540.

52.     As the Supreme Court also pointedly noted, although many decades have passed

since the initial passage of the FHA, "much progress remains to be made in our Nation's

continuing struggle against racial isolation."  *Id*. at 546.

53.     Just as it did in 1968, when the FHA was enacted, where one lives continues today to dictate almost every aspect of an individual's life in America, perhaps most importantly, access to a good education.  The re-segregation of school districts is fueled by factors including "pervasive housing discrimination (to include steering families of color into specific neighborhoods)" and "school zoning practices that intensify racial isolation."[7]

54.     The adverse impacts on children who attend racially concentrated schools cannot be overstated.  One educational nonprofit reported that, nationwide, "predominantly White school districts get $23 billion more than their non-White peers, despite serving a similar number of children," a financial windfall that translates into less crowded classrooms, newer textbooks, fields trips, advanced courses, and access to green space and outdoor recreation.[8]  To that end, an individual family's income is less determinative of their child's access to educational resources than their residence in a majority-white school district.

55.     Segregated communities of color are also far more likely to be exposed to pollution and its attendant environmental health impacts, with a community's racial composition the strongest predictor of whether an environmental hazard, such as a hazardous waste facility, would be sited there.[9]

56.     Discrimination in lending, including the denial of conventional mortgage loans to families of color, exacerbates this problem.

---

[7]     John Kucsera and Gary Orfield, *New York State's Extreme School Segregation: Inequality, Inaction and a Damaged Future*, The UCLA Civil Rights Project (Mar. 2014), at 113.

[8]     EdBuild, *$23 Billion*, https://edbuild.org/content/23-billion (last accessed Sep. 26, 2020).

[9]     Commission for Racial Justice, United Church of Christ, *Toxic Wastes and Race in the United States: A National Report on the Racial and Socio-Economic Characteristics of Communities with Hazardous Waste Sites* xiii (1987); U.S. Comm'n on Civil Rights, *Environmental Justice: Examining the Environmental Protection Agency's Compliance and Enforcement of Title VI and Executive Order 12,898*, at 7-8 (2016) ("Both historical and current housing segregation amplifies the burden of toxic industrial waste on communities of color.").

57.     In denying mortgages to Black and Latinx applicants, private lenders prevent communities of color from accessing an important source of wealth, thereby entrenching and perpetuating generational poverty.

58.     Today, emerging forms of discrimination, such as the use of data analysis and algorithms in decision-making, contribute to the perpetuation of segregated housing and discrimination in residential lending and insurance.

59.     A range of advanced digital techniques, ranging from profiling to data mining, now exist to analyze enormous datasets composed of individual decisions and activities in order to decipher patterns and make predictions.  Decisions to accept or deny a loan or to target who will see a housing opportunity when browsing social media, are strongly influenced by machines and algorithms.[10]

60.     Although these models appear facially neutral, they rely on data inputs to make future predictions, and if the inputs involve flawed or incomplete information that reflects historical inequality, the models can replicate and even amplify human biases affecting protected groups.[11]

61.     All of these developments underscore the continued importance of disparate impact liability.

---

[10]     Maddalena Favaretto *et al., Big Data and Discrimination: Perils, Promises and Solutions.  A Systematic Review*, 6:12 Journal of Big Data 2, 3 (2019); Latanya Sweeney, *Discrimination in Online Ad Delivery*, Data Privacy Lab (Jan. 28, 2013).

[11]     Nicol Turner Lee *et al, Algorithmic Bias Detection and Mitigation: Best Practices and Policies to Reduce Consumer Harms*, Brookings (May 22, 2019).

**HUD's 2013 Rule Properly Codified Well-Established Practice in Disparate Impact Cases**

62.     Congress vested the authority and responsibility for administering the FHA in HUD and authorized the Secretary to issue regulations interpreting the FHA.  42 U.S.C. § 3608.

63.     In 2013, HUD promulgated a new rule setting forth how liability can be established under the FHA based on proof of discriminatory effects rather than discriminatory intent.  *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013) (the "2013 Rule").  The 2013 Rule, as it currently appears in 24 C.F.R. § 100.500, is attached as Exhibit B.

64.     The 2013 Rule reflected decades of accumulated experience in the adjudication of disparate impact claims, both at HUD and in the courts.  The 2013 Rule defined an unlawful "discriminatory effect"; set forth what could be recognized as a "legally sufficient justification"; and codified the familiar three-part burden shifting framework.  Unlike the 2020 Rule, the 2013 Rule did not alter existing law or purport to change applicable procedures for the adjudication of disparate impact claims.

65.     The 2013 Rule was silent with respect to pleading requirements.

66.     Under the 2013 Rule, a victim of housing or lending discrimination has the initial burden of proving that a policy or practice causes or predictably will cause a discriminatory effect, with a disproportionate impact on protected individuals, or that it will create, increase, reinforce or perpetuate "segregated housing patterns."  24 C.F.R. § 100.500(c)(1).

67.     Under the 2013 Rule, if the plaintiff is able to meet their burden, the defendant may then justify its actions by providing evidence that the policy or practice is necessary to achieve "substantial, legitimate, nondiscriminatory interests."  24 C.F.R. § 100.500(c)(2).

68.     Finally, under the 2013 Rule, even if the defendant proves a valid interest, the plaintiff can still prevail by proving that "the substantial, legitimate, nondiscriminatory interests

supporting the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3).

69.     The 2013 Rule codified decades of well-accepted judicial interpretation and agency practice.  HUD and the courts have continued to follow the approach codified by the 2013 Rule since its promulgation.

### The 2020 Rule Is Inconsistent with the Language and Intent of the FHA and Decades of Federal Practice under the Statute

70.     On August 19, 2019, HUD published a Proposed Rule to replace the 2013 Rule. The Proposed Rule altered HUD's definition of "discriminatory effect," introduced novel pleading requirements, created new defenses and overhauled the well-accepted burden-shifting rules. *HUD's Implementation of the Fair Housing Act's Disparate Impact Standard*, 84 Fed. Reg. 42854, 42854 (the "Proposed Rule").

71.     HUD issued the final 2020 Rule on September 24, 2020.  85 Fed. Reg. 60288.

72.     The 2020 Rule strikes the perpetuation of "segregated housing patterns" from the definition of "discriminatory effect," as it appears in the 2013 Rule.  85 Fed. Reg. at 60306, 60332 (24 C.F.R. § 100.500(a)).  HUD's decision to remove references to segregated housing patterns from its new disparate impact rule highlights the agency's disregard for the core purpose of the FHA and is not justified by, or even consistent with, *Inclusive Communities.*

73.     The 2020 Rule dilutes the protections afforded by the FHA by requiring claimants to anticipate defenses and plead facts they may have no ability to discover before filing their claim; giving defendants a wide variety of new defenses that cannot be reconciled with the purpose of the FHA; and discarding the well-established burden-shifting framework that has been used for decades not only in housing discrimination cases, but in a wide variety of other kinds of civil rights actions such as those under Title VII.  The 2020 Rule deviates from the

Proposed Rule, however, by announcing a new "outcome prediction" defense that was never subject to notice or comment.

74.     Consistent with its overreaching intent to tilt the scales in favor of property owners and mortgage lenders, the 2020 Rule also signals to potential defendants that they should not collect data that might reveal the disparate impacts of their practices or policies, and eliminates the availability of exemplary damages in administrative cases.

75.     HUD asserts that the 2020 Rule does not create new standards for liability under the FHA, but merely brings the 2013 Rule into alignment with the Supreme Court's decision in *Inclusive Communities* and provides clarity to members of the public seeking to comply with the FHA or to bring a claim for disparate impact that meets the requirements outlined in *Inclusive Communities*.

76.     Contrary to HUD's assertions, the 2020 Rule is directly contrary to *Inclusive Communities*; introduces novel pleading and proof requirements, and new defenses, which upset accepted practice and undermine enforcement of the FHA; and will inevitably confuse members of the public seeking to understand their rights and obligations under the FHA.

**The 2020 Rule Imposes Prohibitive New Pleading Requirements**

77.     Under the 2020 Rule, a plaintiff is not only required to plead that "a specific, identifiable policy or practice has a discriminatory effect"; a plaintiff must also "sufficiently plead facts" to support each of five new elements:

> (1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;
>
> (2) That the challenged policy or practice has a disproportionately adverse effect on members of a protected class;

(3) That there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect;

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct relation between the injury asserted and the injurious conduct alleged.

2020 Rule, 24 C.F.R. § 100.500(b).

78.     The 2020 Rule then permits a defendant, again at the "pleading stage," to "establish" that the plaintiff failed to make out a case by "showing" that a plaintiff has failed to sufficiently plead facts to establish any of the required elements of a prima facie case.  2020 Rule, 24 C.F.R. § 100.500(d)(1).  In effect, this requires a plaintiff, without the benefit of discovery, not only to meet the overwhelming demands of the 2020 Rule's new five-part pleading requirements, but also to anticipate in their complaint every practical, profit-oriented, policy consideration or requirement of law a defendant might invoke in defense of its discriminatory policy or practice.

79.     By imposing these onerous requirements at the pleading stage, the 2020 Rule will deter the filing of complaints and prevent victims of housing or lending discrimination from engaging in pretrial discovery and obtaining a full and fair adjudication of their claims.

80.     None of the new elements a plaintiff must allege under the 2020 Rule's pleading provisions is required by or consistent with the FHA or *Inclusive Communities*.  To the contrary, they undermine the ability of victims of housing and lending discrimination to pursue the disparate impact liability *Inclusive Communities* described as central to the FHA's statutory scheme.

81.     HUD acknowledges that it lacks the authority to dictate pleadings standards to the federal courts and can, at most, set forth the required elements of a disparate impact claim under the FHA.  85 Fed. Reg. at 60307-60308.  The 2020 Rule itself is silent as to whether the new pleading requirements it imposes apply only in administrative proceedings at HUD or also in the courts.  HUD implies throughout the preamble to the 2020 Rule, however, and in its response to submitted comments that the new rule is intended to apply both at HUD and in the courts.

**The 2020 Rule Invents Broad and Unjustifiable New Defenses**

82.     While the 2020 Rule piles up the burdensome requirements plaintiffs must meet to bring and sustain their case, it eases the burdens of proof on defendants, and arms them with a slew of new defenses to escape liability.

83.     The 2020 Rule gives a defendant the opportunity to rebut a victim's allegation that the challenged policy or practice is "arbitrary, artificial and unnecessary" simply by producing evidence showing that the challenged policy or practice "advances a valid interest," 2020 Rule, 24 C.F.R. § 100.500(c)(2), rather than by showing that the interest be "substantial, legitimate, [and] non-discriminatory," as required by the 2013 Rule.  24 C.F.R. § `100.500(c)(2).

84.     Even if a plaintiff survives a motion to dismiss at the pleading stage, the 2020 Rule provides that a defendant may still escape liability by demonstrating that the discriminatory policy or practice "is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practices does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class."  2020 Rule, 24 C.F.R. § `100.500(c)(2)(i).

**The 2020 Rule Imposes New Burdens of Proof That Unreasonably Favor Business Interests**

85.     Whereas under the 2013 Rule a plaintiff could still succeed on a disparate impact claim, even if the defendant offered a nondiscriminatory justification,  by "proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect," 2013 Rule, 24 C.F.R. § 100.500(c)(3), the 2020 Rule improperly and unjustifiably raises this ultimate burden of proof, requiring a plaintiff to prove not only that a practice with less discriminatory effects exists, but also that the alternative practice serves the defendants' identified interest "in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant."  2020 Rule, § 100.500(c)(3).

86.     Requiring a victim to identify an alternative that is least costly or burdensome to defendants introduces a profit defense to justify discriminatory practices—a result completely at odds with the language and history of the FHA and civil rights law in general.

87.     By allowing a profit defense, HUD endorses the commodification of exclusion, permitting discrimination to continue to preserve profits—a result that neither Congress nor the courts have never condoned.

88.     HUD has not offered adequate jurisdiction to drastically rewrite the 2013 Rule and create these heightened burdens of proof, which are inconsistent with decades of HUD's own policies, guidance and decisions.

89.     Nowhere in the Proposed Rule nor the 2020 Rule does HUD meaningfully consider the adverse impact of the new 2020 Rule on access to fair housing, an inexcusable failure given HUD's statutory mandate to eradicate, not perpetuate, housing discrimination.

90.     In sum, the 2020 Rule's extraordinary new pleading requirements, available defenses, and burdens of proof will deter and prevent victims of housing and lending

discrimination from seeking and obtaining relief under the FHA, contravening HUD's statutory obligation to affirmatively further fair housing.

91.     The 2020 Rule is contrary to the text and purpose of the FHA because it undermines, rather than furthers, the goal of fair housing; stands in the way of efforts to combat discrimination; and will make it much harder to foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics.

92.     The 2020 Rule is an arbitrary and capricious departure from 2013 Rule.

93.     If the Court does not set it aside, the 2020 Rule will leave victims short of the promise of fair housing that Dr. King and other civil rights leaders called for and that Congress sought to achieve through the FHA.

94.     The Plaintiffs will suffer irreparable harm if the 2020 Rule is permitted to take effect.

## CLAIMS

### Count I:  <u>Violation of the APA – Contrary to Law</u>

95.     Plaintiffs adopt by reference the allegations of ¶¶ 1-94 of this Complaint.

96.     HUD's 2020 Rule is final agency action reviewable in this court under 5 U.S.C. § 704.

97.     The APA empowers federal courts to "hold unlawful and set aside agency actions," such as the 2020 Rule, that are "not in accordance with law."  5 U.S.C. § 706(2)(A).

98.      Congress declared in 42 U.S.C. § 3601:  "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."

99.     To implement this national policy, in 42 U.S.C. § 3608(e)(5) Congress commanded the Secretary of HUD "to administer the programs and activities relating to housing

and urban development in a manner affirmatively to further the policies" of preventing and eliminating discriminatory housing practices.

100.    In promulgating the 2020 Rule, Secretary Carson and HUD have violated the clear statutory command of the FHA to affirmatively further fair housing and have, instead, chosen to protect the financial interests of property owners and lenders who engage in discriminatory practices.

101.    The novel pleading rules, defenses and burden shifting provisions of the 2020 Rule erect unreasonable barriers to the pursuit of disparate impact claims.

102.    The Court should vacate the 2020 Rule under 5 U.S.C. § 706(2)(A) because the 2020 Rule is inconsistent with the text of the FHA, undermines its core purposes, and is thus not in accordance with law.

### Count II:  Violation of the APA – Arbitrary and Capricious

103.    Plaintiffs adopt by reference the allegations of ¶¶ 1-102 of this Complaint.

104.    The APA empowers federal courts to "hold unlawful and set aside agency actions," such as the 2020 Rule, that are "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).

105.    HUD has not provided reasoned justification for its decisions to abandon its 2013 Rule, which codified well-accepted interpretations of the FHA and burden-shifting rules, and to replace it with the 2020 Rule, which undermines the purposes of the FHA; introduces new pleading requirements and creates novel defenses that cannot be reconciled with the FHA; and discards long-standing burden-shifting rules in favor of a new framework that puts profits ahead of fairness.

106.    HUD's purported reliance on *Inclusive Communities* as the basis for its radical departure from the 2013 Rule is a pretext; *Inclusive Communities* did not require, or even

encourage, the adoption of HUD's new Rule.  The 2020 Rule is inconsistent with *Inclusive Communities.*

107.     HUD relied on factors Congress did not intend the agency to consider when HUD invented the new defenses introduced in the 2020 Rule and altered the well-established burden-shifting framework.

108.     HUD's distinction between "single events" and "policies and practices" is artificial, unexplained and inconsistent with the purposes of the FHA.

109.     HUD's new pleading rules are internally inconsistent and of uncertain application.

110.     HUD did not take adequate account of the differences between the new pleading rules established by the 2020 Rule and the Federal Rules of Civil Procedure.

111.     HUD did not take adequate account of the adverse impact its 2020 Rule would have on the ability of aggrieved parties to prosecute valid housing and lending discrimination claims.

112.     The Court should vacate the 2020 Rule under 5 U.S.C. § 706(2)(A) because the 2020 Rule is arbitrary and capricious.

### Count III:  Violation of the APA – Notice and Comment

113.     Plaintiffs adopt by reference the allegations of ¶¶ 1-112 of this Complaint.

114.     The APA directs federal courts to hold unlawful and set aside federal agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

115.     HUD was required both by the FHA, 42 U.S.C. § 3614a, and the APA, 5 U.S.C. § 553, to provide adequate notice and opportunity for comment before promulgating the 2020 Rule.

116.     In its 2019 Proposed Rule, HUD introduced an "algorithmic model" defense that sought to shield defendants from liability for policies or practices which utilized algorithms that

were (a) based on "neutral inputs" that were not substitutes for protected characteristics such that the model was not predictive of risk or other valid objectives; (b) considered "industry standard," used for the intended purpose of the third party, and the responsibility of the third party; or (c) analyzed by a neutral third party who determined the model was empirically derived, that its inputs were not substitutes for a protected characteristic, the model was predictive or risk or other valid objective, and was a demonstrably and statistically sound algorithm.  84 Fed. Reg. at 42862.

117.    In the 2020 Rule, HUD discarded the "algorithmic model" approach and inserted an opaque, new provision allowing a defendant to avoid liability by demonstrating that the policy or practice being challenged "is intended to predict the occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly situated individuals not part of the protected class."  85 Fed. Reg. at 6033, 2020 Rule, 24 C.F.R. § 100.500(d)(2)(i).

118.    HUD never gave the public notice of, or any opportunity to comment on, the "outcome prediction" defense that was first announced when the 2020 Rule was published.

119.    The "outcome prediction" defense in the 2020 Rule is not the same as the "algorithmic model" defense in the Proposed Rule.  It is a new and entirely different defense than what HUD made available for notice and comment when it published the Proposed Rule.

120.    Under both the FHA and the APA, HUD was required to give notice of its proposed "outcome prediction" defense and provide an opportunity for comment before adopting the 2020 Rule, but HUD did not do so.

121.    The Court should vacate the 2020 Rule under 5 U.S.C. § 706(2)(A) because the 2020 Rule was adopted without adequate notice and comment.

## Count IV:  <u>Violation of the APA – Without Lawful Authority</u>

122.     Plaintiffs adopt by reference the allegations of ¶¶ 1-121 of this Complaint.

123.     The APA directs federal courts to hold unlawful and set aside federal agency action that is "in excess or statutory jurisdiction [or] authority."  5 U.S.C. § 706(2)(C).

124.     The 2020 Rule purports to create new pleading requirements, motion practice and burden-shifting rules for all disparate impact complaints, whether they are brought to the FHA by charging parties under 42 U.S.C. § 3610 or brought by plaintiffs in federal or state court.

125.     HUD has no statutory power to alter pleading, motion or trial practice in the federal or state courts.

126.     HUD has no authority to promulgate retroactive rules under the FHA.

127.     Even if it were valid, the 2020 Rule cannot lawfully be applied to pending claims at HUD or in the courts.

## PRAYERS FOR RELIEF

Wherefore, the Plaintiffs respectfully request that the Court grant the following relief:

1.     Upon motion, issue a preliminary injunction under 5 U.S.C. § 705 postponing the effective date of the 2020 Rule pending conclusion of this review proceeding.

2.     Declare that HUD's 2020 Rule violates the Administrative Procedures Act and the Fair Housing Act.

3.     Vacate the 2020 Rule and set it aside under 5 U.S.C. § 706.

4.     Award Plaintiffs reasonable attorneys' fees and costs under the Equal Access to Justice Act or as otherwise authorized by law.

5.     Such other relief as justice may warrant.

By their attorneys,

/s/ Lauren Sampson
Lauren Sampson (BBO # 704319)
Oren Sellstrom (BBO # 569045)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, Massachusetts 02210
(617) 482-1145

Scott P. Lewis (BBO # 298740)
Mina S. Makarious (BBO # 675779)
Annie E. Lee (BBO # 705568)
ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, Massachusetts 02109
(617) 621-6525

September 28, 2020