IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS INC., <br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development,<br><br>*Defendants.* | Case No. 3:20-cv-11765-MGM |

## **DECLARATION OF MERIS BERGQUIST**

I, Meris Bergquist, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

### Introduction

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by the Massachusetts Fair Housing Center, Inc. ("MFHC").

2. I am the Executive Director of MFHC, a nonprofit civil rights advocacy organization located in Holyoke, Massachusetts.

3. I am making this declaration in support of MFHC's civil rights complaint and motion for a stay pursuant to 5 U.S.C. § 705 against the United States Department of Housing and Urban Development (HUD) regarding the enforcement of *Implementation of the Fair Housing Act's Disparate Impact Standard*, 85 Fed. Reg. 60288 (September 24, 2020) (the "2020 Rule"), which if implemented, will irreparably harm MFHC.

### Organizational Background

4. Established over thirty years ago, MFHC is the oldest private organization devoted solely to fair housing advocacy in Massachusetts. We currently serve the residents of Western and Central Massachusetts.

5. MFHC takes a multi-faceted approach to achieving its fair housing mission. This includes conducting extensive public education and outreach, vigorously enforcing the fair housing laws, providing housing counseling and support for recipients of housing assistance, and actively engaging in public policy advocacy and impact litigation.

6. The goal of MFHC's public education and outreach program is to educate the public about their fair housing rights; help them recognize if their rights have been violated; and encourage them to report discrimination to MFHC. Every year, MFHC presents approximately 30 trainings to over 600 individuals in Western and Central Massachusetts.

7. MFHC also maintains an active legal program, with a fair housing testing component. MFHC's fair housing testers investigate individual complaints of housing discrimination, as well as conduct audit tests to determine the prevalence of illegal housing discrimination, when there is no complainant.

8. MFHC receives over 300 complaints of housing discrimination a year. When MFHC finds evidence of discrimination, we provide legal representation to the victim to obtain compensatory and injunctive relief. The injunctive relief is designed to have a deterrent effect.

9. When MFHC finds discrimination through auditing testing, it has legal standing, as an "aggrieved party," under the FHA, 42 USC § 3602(i) and 24 CFR 100.20, to pursue complaints of housing discrimination before administrative agencies and in Court.

10. HUD has acknowledged MFHC's standing to bring complaints of discrimination under the FHA as an "aggrieved party" in, most recently, *MFHC v. Kamins of Amherst, Inc., et al.,* FHEO No. 01-19-2559-8 (September 11, 2020).

11. MFHC also operates a housing mobility program, SUN, to decrease racial and ethnic segregation by increasing housing choices for recipients of housing vouchers, who are interested in moving to communities of opportunity.

### The 2020 Rule Will Irreparably Harm MFHC and its Client Communities

12. MFHC seeks to enjoin the 2020 Rule because if implemented, the 2020 Rule would immediately and irreparably harm MFHC by precluding our ability to challenge neutral policies that perpetuate segregation or disproportionately harm individuals in a protected class.

13. The consequences for MFHC and its clients are profound since MFHC serves the residents of a metropolitan area with the highest rate of segregation between Latinos and Whites in the nation. That same area is in the top 20% nationwide for the highest rate of segregation between African Americans and Whites.

14. Enacting this arbitrary Rule during a global pandemic is especially pernicious because Black and Latino residents of segregated communities are at much greater risk of contracting COVID-19 and dying than their white counterparts.[1]

15. As recently outlined in an environmental justice brief from the Attorney General of Massachusetts, Black and Latino residents of segregated communities live in communities marked by high rates of air and water pollution, overcrowded, older housing, and a lack of green space and healthy food, which in turn leading to increased asthma, diabetes, and obesity rates.[2] These underlying health conditions cause worse outcomes for those diagnosed with COVID-19.

16. The impact of segregation on the health of Hampden County residents, who live in segregated communities, is dire because Hampden County is the worst county for health outcomes in the State, according to a 2017 Report by the Pioneer Valley Planning Commission and Partners for a Healthier Community.[3]

17. The high rates of segregation in Hampden County also lead to stark health disparities between Black/African-American and Latino/Hispanic populations compared to White populations. For example:

    a. Hospitalization for stroke and heart disease: 50% higher rates than for Whites;
    b. Hospitalization for diabetes: three times that of Whites (higher in Chicopee)
    c. Hospitalization and ER visits for asthma: for African-Americans it is three times the state rate and Latinos are four times the state rate; in Westfield and West Springfield, ER visits are three times that of Whites.
    d. ER visits for COPD: among African Americans, rates are three times higher than the state.[4]

18. According to the CDC, a history of stroke, heart disease, diabetes, asthma and COPD are all underlying health conditions that are known to cause worse outcomes for those diagnosed with COVID-19.[5]

19. Throughout Western Massachusetts, neutral policies perpetuate this entrenched racial and ethnic segregation and have a disproportionately negative effect based on race and national origin.

---

[1] *See, e.g.,* Vanessa Williams, *Residential segregation plays a role in coronavirus disparities, study finds*, Washington Post (Aug. 17, 2020), available at: https://www.washingtonpost.com/nation/2020/08/17/residential-segregation-plays-role-covid-19-disparaties-study-finds/ (observing higher rate of people of color is due to "poverty and living in densely occupied households, living in localities with greater air pollution, lack of health insurance, and being employed in jobs that increase exposure to the coronavirus").
[2] Available at: https://www.mass.gov/doc/covid-19s-unequal-effects-in-massachusetts.
[3] Available at: http://www.pvpc.org/sites/default/files/doc-hampden-county-health-improvement-plan-chip2932.pdf
[4] *Id*.
[5] Available at: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html

20. In early 2020, the City of Agawam, which is 93.7% White and 1.7% Black, proposed a new ordinance to regulate accessory apartments. The ordinance's stated purpose was to provide older homeowners with a means of obtaining rental income and to add moderately priced rental units to the housing stock to meet the needs of smaller moderate-income households.

21. However, in its current form, the regulation prevents homeowners from renting an accessory unit to anyone other than immediate family members.

22. This new regulation would disproportionately affect the housing rights of African Americans and Latinos, and perpetuate segregation in Hampden County, the epicenter of intense residential racial and ethnic segregation in Western Massachusetts.

23. A similar rental policy was successfully challenged in post-Hurricane Katrina New Orleans, when St. Bernard Parish tried to limit landlords from renting to anyone who was not a blood relative. *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 641 F.Supp.2d 563 (E.D. La. 2009).

24. Before the publication of the 2020 Rule, MFHC would have prioritized advocacy to challenge the Agawam ordinance as discriminatory, because it perpetuates segregation in Western Massachusetts and has a disparate impact on Blacks and Latinos.

25. With the advent of the 2020 Rule, MFHC is precluded from arguing that the "immediate family" rental requirement in the Accessory Apartment ordinance will perpetuate segregation. This particular "effect," which could be shown under the 2013 HUD, rule was dropped without discussion in the proposed and final 2020 Rule.

26. The 2020 Rule also prevents MFHC from bringing a disparate impact claim against the City of Agawam, because it would be difficult, if not impossible, to meet each of the five new pleading elements that HUD has arbitrarily inserted in its new Rule.

27. As a matter of logic, plaintiffs will not be able to satisfy the first element, which requires a plaintiff to plead sufficient facts to prove a negative—that is, the absence of a valid interest or legitimate objective by the City of Agawam. As the 2020 Rule is written, the failure to satisfy even one element of the new pleading requirements is fatal to a plaintiff's complaint.

28. Under the 2020 Rule, MFHC and its clients would be forced to, without the benefit of discovery, predict and plead sufficient facts to counter any possible rationale the City could conjure to justify this policy. It would be virtually impossible for such a challenge to succeed—even though the Supreme Court specifically identified this as the kind of case that *should* succeed under the Fair Housing Act. *See Tex. Dep't. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 539-40 (2015) (identifying *Greater New Orleans Fair Housing Action Center* as a suit "resid[ing] at the heartland of disparate-impact liability" as such practices "function unfairly to exclude minorities from certain neighborhoods without any sufficient justification.").

29. By requiring MFHC and its clients to show a policy is arbitrary, artificial or unnecessary prior to requiring a defendant to demonstrate a valid interest, HUD is impermissibly focusing on the defendant's intent, rather than the policy's impact.

30. The Agawam ordinance is just the most recent example of an exclusionary zoning policy that perpetuates segregation in MFHC's service area.

31. There are many other exclusionary zoning policies in Western Massachusetts, according to the Pioneer Valley Planning Commission's 2014 Regional Report:

    "Zoning is one of our region's primary impediments to fair housing choice since they can have the secondary effects of limiting housing choices for the middle Class, poor, minorities, families with children and other protected classes, *whether intentional or not.* Examples of "exclusionary" zoning practices could include large minimum lot size requirements and *bans on multifamily housing. Exclusionary zoning practices, which limit mobility, have helped to maintain the dominant spatial pattern of economic and racial segregation found in [the] Pioneer Valley* as well as in most metropolitan areas of the United States.  It has also been identified as one of the causes of the state's affordable housing crisis…." (emphases added.)[6]

32. This report also identified 19 municipalities in the Pioneer Valley with zoning policies that prohibit the development of multi-family housing as a matter of right. These pervasive exclusionary zoning policies make it all but impossible to develop multi-family (rental) housing in 19 communities in Western Massachusetts.

33. The direct effect of these policies is to severely limit the availability of rental housing opportunities in majority-white communities. Since the percentage of Black and Latino households that live in rental housing is greater than the percentage of White households, these policies help to maintain the segregated status quo and limit the ability of Blacks and Latinos to move to majority-white communities.

34. In addition, MFHC is deeply concerned about the commonplace policy of housing authorities in majority-white cities in Western Massachusetts, including Northampton, to give a preference for admission to public housing only to those applicants to already reside in their municipality.

35. These kinds of exclusionary policies make it extremely difficult for residents of segregated communities to move into more integrated communities. Unless the new Rule is enjoined, advocates like MFHC will not be able to challenge policies that cause irreparable harm to the life and health of Black and Latino families.

<u>Limiting the Housing Opportunities of Section 8 Voucher Holders.</u>

---

[6]Available at: http://www.pvpc.org/sites/default/files/PV%20Housing%20Plan.pdf

36. If the 2020 Rule comes into effect, it will also limit the ability of MFHC's housing mobility program, SUN, to counsel, support and enforce the fair housing rights of Section 8 recipients, who reside in segregated communities.

37. Housing vouchers, in theory, expand housing choice. However, because of neutral policies that have a disproportionately negative effect on voucher holders, these families and individuals are unable to move to more integrated communities, with greater vocational and educational opportunities.

38. One neutral policy in particular creates an almost insurmountable barrier for Section 8 recipients to access housing in opportunity communities. This policy requires that applicants provide the first and last month's rent to be paid before moving in, and that an applicant's income is more than three times the rent.

39. Based on my familiarity with the rental housing market in Central and Western Massachusetts, I can affirm that these neutral policies are rampant in Western Massachusetts. For example, a local realty agency, Rent Noho, which has a large share of the rental market in Hampshire County, enforces the eligibility requirement that an applicant's income must be more than three times the rent.

40. This neutral income requirement categorically excludes recipients of Section 8 (or other) housing vouchers, because eligibility for Section 8 is limited to individuals with low-incomes. However, having a Section voucher always makes the rental housing affordable and will always cover the first and last month's rent.

<u>The 2020 Rule Will Frustrate MFHC's Mission and Threaten the Structure of the Organization</u>

41. In 2018, MFHC initiated a strategic planning process and adopted a new mission statement: to end systemic housing discrimination and create inclusive communities.

42. In accord with the strategic plan and to advance our new mission, MFHC has been consistently engaged in greater public policy advocacy and impact litigation to eliminate systemic housing discrimination throughout our service area.

43. The 2020 Rule strikes at the heart of MFHC's mission, imposing near-insurmountable barriers to the achievement of core institutional goals.

44. HUD will make it near impossible for MFHC to bring a disparate impact claim against the above referenced landlords and realtors, and frustrate our ability to achieve the integrationist goals of our SUN housing mobility program.

45. In placing significant and unjustified barriers on victims of housing discrimination, HUD has gravely injured MFHC's ability to engage in the kind of housing discrimination enforcement performed by grantees under HUD's Fair Housing Initiatives Program.

46. The 2020 Rule will also have a negative effect on our case intake process. If the Rule goes into effect, MFHC will have to avoid bringing claims:

    a. to protect individuals who have been discriminated against based on race or national origin by landlords who deny housing because of an applicant's criminal history; or

    b. to protect female victims of domestic violence who have been discriminated against because of their sex by landlords who try to evict them based on a neutral lease term that prohibits disruptive or criminal behavior in the unit.

47. This disruption to our mission and ability to challenge systemic housing discrimination is not speculative. Last week, we discovered that a housing provider in a high opportunity, majority-white community may have a policy of refusing to rent to anyone with a criminal history. Under previous HUD guidance on criminal history discrimination,[7] and the previous Disparate Impact Rule, we would have committed time and resources to investigate this case as a potential disparate impact claim.

48. However, with all of the uncertainly and burdens imposed by the new Rule, it would be unwise and imprudent for MFHC to expend these resources now. Unfortunately, our inability to challenge the racially discriminatory impact of criminal history screening by landlords, which HUD previously encouraged because it had a disparate impact based on race and national origin,[8] will result in far fewer housing opportunities for individuals in protected classes.

49. The 2020 Rule will also interfere with our education and outreach programs. We will have to modify our trainings for the public and re-train our staff on the 2020 Rule, which is vague and difficult to interpret. This will necessitate the diversion of staff time and resources, which are under considerable pressure due to the COVID-19 pandemic.

50. Given all of the facts enumerated above, it is imperative that this Court enjoin the HUD rule. If the Rule takes effect, it will be impossible to dismantle all of the existing policies—including exclusionary zoning policies—that unjustifiably perpetuate the intense racial and ethnic segregation that continues to cause irreparable harm to the lives and health of Black and Latino residents of Western Massachusetts, especially during this pandemic.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

---

[7] Available at: https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF
[8] *Id*.

DATED this 4th day of October 2020, at Holyoke, Massachusetts.

*Meris Bergquist*

                                            Meris Bergquist
                                            Executive Director
                              Massachusetts Fair Housing Center