IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Massachusetts Fair Housing Center,

Plaintiff,

v.                                                              Case No.

United States Department of Housing
and Urban Development *and* Secretary
of Housing and Urban Development
Benjamin Carson, *in his official capacity*,

Defendants.

## DECLARATION OF WILLIAM BERMAN

I, William Berman, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by the Suffolk University Law School Housing Discrimination Testing Program ("HDTP").

Suffolk University Law School Housing Discrimination Testing Program

2. I am a clinical professor at Suffolk University Law School and have been a member of the faculty at Suffolk Law School since 2000. In addition to my clinical work, I am Director of Suffolk University's Housing Discrimination Testing Program. HDTP has trained over 500 testers, has conducted over 700 housing discrimination tests, trained thousands of people in their fair housing rights and obligations, returned thousands of dollars to victims of discrimination, trained hundreds of students in fair housing law, put on conferences for fair housing advocates, developed fair housing curricula and conducted academic studies that have produced empirical data on housing discrimination.

3. HDTP's mission is to work toward eliminating housing discrimination through testing, enforcement, education and outreach, academic study and the development of fair housing curriculum.

HDTP's Fair Housing Work

4. HDTP uses matched pair testing methodology to gather evidence of the typical business practices of housing providers in the rental market, so as to determine whether they are discriminating against individuals in protected classes. Matched pair testing is a methodology that can be used for either empirical study or

housing discrimination enforcement. Testing is an important methodology for determining evidence of discrimination (or lack thereof) and has been recognized as such by the courts. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); *Richardson v. Howard*, 712 F.2d 319 (7th Cir.1983).

5. HDTP does both complaint based and systemic testing and has the capability to test all federal protected classes. HDTP brings enforcement cases through the Accelerator Practice, a clinical program in which students are supervised in handling cases by instructors who are licensed attorneys. HDTP also conducts testing for various agencies such as HUD, the Massachusetts Commission Against Discrimination, the Boston Office of Fair Housing and Equity and the Massachusetts Office of the Attorney General, among others. Through its work, HDTP is aware that housing discrimination and its insidious effects is far too common and that fair housing advocates need all the tools at their disposal to combat this scourge.

6. In July 2020, HDTP in collaboration with the Analysis Group, Inc. published an empirical study that examined race-based and subsidized-housing-voucher-based discrimination in the Greater Boston rental housing market. *See* Jamie Langowski, William Berman et.al., *"Qualified Renters Need Not Apply: Race and Voucher Discrimination in the Metro Boston Rental Housing Market,"* (July 1, 2020), accessible at https://www.tbf.org/-/media/tbf/reportsand-covers/2020/housing-voucher-report-20200701.pdf. (hereinafter, the "Study"). The Study was funded by the Boston Foundation. Testers recorded the details of their interactions with housing providers in written reports, which researchers analyzed across multiple comparative data points to determine whether testers received truthful information about the availability of a property and whether housing providers treated testers differentially. The Analysis Group reviewed and analyzed forty-four identified outcome variables determined by the recorded, standardized information points resulting from the testing.

7. The testing results showed that race alone is a significant obstacle to finding a rental apartment. Black market-rate renters were able to visit only 48% of the apartments they sought, compared to the White market-rate renters, who were able to visit 80% of the same apartments. The testing results indeed indicated that housing providers "screened out" Black renters in general based just upon their names 11% of the time, without ever communicating with the prospective renter. Even when there had been some initial interaction between providers and Black market-rate renters, providers later ceased all communication with Black market-rate renters who were trying to contact them to set up an appointment to view the property 18% of the time, compared to only 4% of the time for similarly situated White renters seeking the same apartments.

8. The Study also identified more subtle forms of differing treatment received by Black and White prospective renters. Housing providers offered White market-rate renters more financial and nonfinancial incentives (40% of the time for White market-rate renters versus 8% for Black market-rate renters), made more positive comments to them about the unit or neighborhood (58% of the time for White market-rate renters versus 33% for Black market-rate renters), and offered applications to a higher percentage of White renters (41% of the time for White market-rate renters versus 24% for Black market-rate renters). The data shows significant barriers to Black renters in the rental market.

The Impact of the Challenged Rule on HDTP's Work

9. On October 16, 2019, HDTP expressed its opposition to the then proposed rule changing the disparate impact standard in comments to the U.S. Department of Housing and Urban Development.

10. I understand that HUD has now issued a final regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule"), and I have reviewed the rule.

11. The HDTP sees firsthand the high levels of discrimination that occur in the rental housing market. Much of this discrimination happens without the person experiencing it being aware that it is happening. Not only is discrimination hard for people to detect, but enforcement of the Fair Housing Act has largely fallen to non-profits and advocacy organizations. The Final Rule will make it even more difficult for people and organizations experiencing discrimination to challenge the policies or practices of housing providers, businesses, and governments that seem neutral, but actually have purposeful or unintended discriminatory consequences. HUD has interpreted the Fair Housing Act to prohibit housing practices that have a discriminatory effect (whether intended or not) for decades.

12. Disparate impact cases are already incredibly difficult to prove and there is no need to change the standard. It is well understood that acts of housing discrimination are underreported and that there are far more acts occurring than complaints being filed.

13. HUD should not interpret the *Inclusive Communities* decision to require a plaintiff to show a policy or practice is arbitrary, artificial and unnecessary prior to requiring a defendant to identify a valid interest behind the policy or practice. Such a structure strays from the intended purpose of the analysis, which should be to focus on the impact of the policy or practice, rather than the intent of the policy or practice's purveyor. Victims of discrimination should not have to guess at what justifications a defendant would argue, nor should they be the ones required to identify "a less discriminatory policy or practice that would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant." The knowledge required to meet that burden is within the defendant's purview, not a plaintiff's. The Final Rule would make disparate impact claims significantly more onerous to prove, and as a result, will leave certain discriminatory impacts unaddressed. The Final Rule will create additional barriers to filing complaints for people who have experienced discrimination and will make it more difficult to combat discrimination and the segregation it causes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED the 30th day of September 2020, at Newton, Massachusetts.

William Berman
Director
Suffolk University Law School Housing
Discrimination Testing Program