# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development, <br><br> Defendants. | Civil Action No. 3:20-cv-11765-MGM |

## DECLARATION OF JANE EDMONSTONE

I, Jane Edmonstone, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by Community Legal Aid ("CLA").

2. I am employed as the Senior Supervising Attorney in the Housing Unit at CLA. CLA provides free civil legal services to residents of Central and Western Massachusetts. Our mission is to improve the lives of low-income and elderly people through legal assistance that protects fundamental rights, secures access to basic needs, and challenges policies and practices that harm our clients.

3. In my role as Senior Supervising Attorney at CLA, I supervise a team of advocates working for housing justice. That work includes fighting for fair and equal access to housing opportunities, ensuring safe and habitable living conditions, and defending against unjust evictions and displacement. I have been licensed to practice law in Massachusetts since 2007.

1

CLA's Housing Justice Work

4. CLA's fair housing work is focused on protecting the rights of tenants to obtain and retain housing free from discrimination.

5. In Worcester County, we run the Worcester Fair Housing Project ("WFHP" or "Project"), which is funded by the U.S. Department of Housing and Urban Development ("HUD"). The WFHP receives a Private Enforcement Initiative (PEI) grant through HUD's Fair Housing Initiatives Program. In order to be eligible for a PEI grant, applicants must be "organizations with experience providing quality fair housing enforcement activities."[1]

6. The WFHP focuses on assisting tenants in combatting a wide array of discriminatory practices. Discrimination in the rental market takes a variety of forms, including but not limited to: refusal to rent, providing inaccurate information about the availability of rental units, steering renters towards or away from certain units or neighborhoods, racial or sexual harassment during a tenancy, denying a disability-related reasonable accommodation or modification request, making discriminatory verbal or written statements, imposing discriminatory limitations or conditions on a tenancy, and taking steps to evict a person for discriminatory reasons.

7. The WFHP educates tenants about their legal rights, investigates potential incidences of discrimination, files discrimination complaints in state and federal court and at the Massachusetts Commission Against Discrimination and HUD, and defends against discriminatory evictions in the Housing Court.

8. The WFHP focuses on the types of discrimination prohibited under the federal Fair Housing Act. Outside of the Project, CLA also assists tenants who have experienced discrimination on the basis of protected categories under state law, such as receipt of rental assistance or subsidy, marital status, and gender identity and expression. Across our geographic service area, we also identify policies or practices of public housing authorities which may disproportionately impact communities of color, such as local residency preferences for admissions or lack of an adequate language access plan, and we advocate that those housing providers change their policies.

9. The Project also trains civil rights investigators to "test" whether housing providers are unlawfully discriminating against tenants and applicants for housing. Testers seek information about the availability of apartments in the rental market and potential differential treatment of applicants.

---

[1] U.S. Department of Housing & Urban Development, *Fair Housing Initiatives Program (FHIP)*, Fair Housing/Equal Opportunity, available at: https://www.hud.gov/program_offices/fair_housing_equal_opp/partners/FHIP#_Eligible_Grantees.

2

10. The U.S. Supreme Court recognized fair housing testing as a legitimate and critical investigative technique in 1982 in Havens Realty v. Coleman, 455 U.S. 363. (1982).

11. Although testing is sometimes responsive to complaints to the Project of personal experiences of discrimination, the Project also conducts what we refer to as "audit" tests. Audit tests are conducted in response to advertisements that include potentially discriminatory language, or in response to other indicia of discrimination.

12. Additionally, CLA's Criminal Records and Re-entry Project helps formerly incarcerated individuals overcome barriers to housing, employment, and other opportunities in order to reintegrate into society. Helping formerly incarcerated people re-enter society and attain steady work and safe housing is an essential first step in their ability to live safe, stable, and productive lives. The Massachusetts Supreme Judicial Court has recognized that there are "compelling government interests in reducing recidivism, facilitating reintegration, and ensuring self-sufficiency by promoting employing and housing opportunities for former criminal defendants." Commonwealth v. Pon, 469 Mass. 296 (2013).

Criminal Records Pose a Barrier to Fair and Equal Access to Housing

13. In 2016, HUD stated the following:

> "As many as 100 million U.S. adults – or nearly one-third of the population – have a criminal record of some sort . . . Since 2004, an average of over 650,000 individuals have been released annually from federal and state prisons, and over 95 percent of current inmates will be released at some point. When individuals are released from prisons and jails, their ability to access safe, secure and affordable housing is critical to their successful reentry to society. Yet many formerly incarcerated individuals . . . encounter significant barriers to securing housing, including public and other federally-subsidized housing, because of their criminal history."[2]

14. The impact a criminal record has extends far beyond the individual former defendant. In most circumstances, it directly impacts the wellbeing and financial security of their families.

15. It has also been found that a criminal record disproportionally impact certain communities based on race. It is well-established that Black and Latinx individuals:

---

[2] U.S. Department of Housing and Urban Development, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions,* available at https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF (Accessed September 28, 2020).

3

> … are consistently arrested, convicted, and incarcerated at rates disproportionate to their share of the general population. Consequently, criminal records-based barriers to housing are likely to have a disproportionate impact on minority home seekers. While having a criminal record is not a protected characteristic under the Fair Housing Act, criminal history-based restrictions on housing opportunities violate the Act if, without justification, their burden falls more often on renters or other housing market participants of one race or national origin over another (i.e., discriminatory effects liability).
>
> Nationally, racial and ethnic minorities face disproportionately high rates of arrest and incarceration . . . Hispanics were [] incarcerated at a rate disproportionate to their share of the general population, with Hispanic individuals comprising approximately 22 percent of the prison population, but only about 17 percent of the total U.S. population. In contrast, non-Hispanic Whites comprised approximately 62 percent of the total U.S. population but only about 34 percent of the prison population in 2014.[3]

16. Here in Massachusetts, authors of the recent report "Racial Disparities in the Criminal Justice System" found that:

    > …Black and Latinx people are overrepresented in the criminal caseload compared to their population in the state. White people make up roughly 74% of the Massachusetts population while accounting for 58.7% of cases in our data. Meanwhile, Black people make up just 6.5% of the Massachusetts population and account for 17.1% of cases. Latinx people are similarly overrepresented, making up 8.7% of the Massachusetts population but 18.3% of the cases in the sample.[4]
    >
    > In addition to being overrepresented relative to their share of the state population, Black and Latinx people are less likely than White people to have their cases resolved through less severe dispositions such as pretrial probation or continuances without finding (CWOFs). Among those sentenced to incarceration, Black and Latinx people sentenced to incarceration receive longer sentences than their White counterparts, with Black people receiving sentences that are an average of 168 days longer and Latinx people receiving sentences that are an average of 148 days longer.[5]

CLA's Investigation of Tenant Screening Practices

17. In recent years, CLA has investigated whether certain housing providers use tenant screening polices and practices which disparately impact communities of color.

---

[3] *Id*.
[4] Bishop, et al, "*Racial Disparities in the Criminal Justice System*," a Report by the Criminal Justice Policy Program, Harvard Law School, available at http://cjpp.law.harvard.edu/assets/Massachusetts-Racial-Disparity-Report-FINAL.pdf (accessed September 28, 2020).
[5] *Id*.

18. CLA identified at least one large housing provider in Worcester County which publicly states in its advertisements and website that it does not accept any renters with felony convictions.

19. If an individual attempts to submit a rental application through the housing providers website, the application will not be processed unless the individual signs a statement that neither the individual nor any member of his or her household has ever been convicted of, or pled guilty or "no contest" to (1) any felony, (2) a sexual offense, or (3) drug-related criminal offense.

20. CLA initiated a testing investigation, which confirmed that the online application system used by the housing provider automatically disqualifies an applicant with a criminal record.

21. CLA has been exploring a possible legal challenge to this housing provider's tenancy screening practices under a disparate impact theory of liability.

The Impact of the Challenged Rule on CLA and its Client Communities

22. I understand that HUD has issued a new regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule"), and I have reviewed the rule.

23. In issuing its 2013 disparate impact rule, HUD confirmed that the federal Fair Housing Act's prohibition against refusing to rent (or otherwise make housing unavailable) to a person because of their race or other protected class includes a prohibition against practices that have unjustified discriminatory effects, even in the absence of discriminatory motives.

24. The Final Rule eviscerates the right to challenge housing practices that have disproportionate discriminatory effects. Under this Rule, it would be practically impossible for CLA to initiate a legal challenge to a housing provider's potentially discriminatory tenant screening practice, such as the one described above.

25. The Final Rule would, among other things, fundamentally alter the pleading standards and affirmative defenses in cases brought on a disparate impact theory under the Fair Housing Act. As a result of that change, the Final Rule has caused and will continue to cause significant harm to our client communities, as well as our organizational mission and operations.

26. The Final Rule places extraordinary burdens on plaintiffs and their advocates, requiring them to allege and subsequently prove five vague and ill-defined elements as part of their *prima facie* case. The Final Rule also requires plaintiffs to somehow anticipate, investigate, and disprove a novel range of defenses in their initial pleadings. It will be virtually impossible for our plaintiffs to obtain the factual information now required by the Final Rule to even avoid dismissal on the pleadings.

27. For example, in order to avoid a motion to dismiss, plaintiffs would have to plead sufficient facts to show that a challenged policy or practice is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration or requirement of law." To garner such facts pre-litigation without the benefit of discovery would be near—if not actually—impossible for the individuals represented by CLA. There are few, if any, avenues for obtaining a private defendant's business or financial records, many of which are likely shielded from public view. Even using "testing" as an approved investigative tool would not, by itself, yield sufficient evidence to meet the pleading standard under the Final Rule. For the individuals in our client communities who file complaints without the assistance of counsel, these burdens will be even greater, as many clients have limited English proficiency and limited access to financial and technological resources.

28. Additionally, even in the absence of litigation, the Final Rule undermines our ongoing advocacy with subsidized housing providers to change policies and practices which have discriminatory consequences.

29. The Final Rule operates to frustrate the efforts of our housing justice advocacy and impedes CLA's mission to improve the lives of our clients through legal assistance that protects fundamental rights and challenges policies and practices which harm our clients.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED this 29th day of September 2020, at Williamsburg, Massachusetts.

*/s/ Jane Edmonstone*
Jane Edmonstone
Senior Supervising Attorney, Housing Unit
Community Legal Aid