IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS INC., <br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development,<br><br>*Defendants.* | Case No. 3:20-cv-11765-MGM |

## DECLARATION OF JOSEPH MICHALAKES

I, Joseph Michalakes, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by Greater Boston Legal Services ("GBLS").

2. I serve as a Staff Attorney in the Housing Unit at GBLS. GBLS is a nonprofit legal aid organization that helps more than 10,000 low-income individuals and families solve civil legal issues each year across Greater Boston. In addition to direct representation of clients in federal and state civil legal proceedings and in administrative hearings, GBLS advocates promote systemic changes to the law through impact and appellate litigation, legislative advocacy, and community legal education. In the Housing Unit, GBLS advocates work primarily to defend hundreds of low-income tenants from eviction, largely through direct representation in landlord-tenant proceedings in state court.

3. Because Greater Boston, like many major metropolitan areas across the country, is currently in the throes of an unprecedented affordability crisis, the Housing Unit focuses its work upon the preservation of affordable housing. That is, our advocates prioritize eviction cases involving voucher holders and residents of subsidized units who would not otherwise be able to afford to live in the region without access to a subsidy; support grassroots community organizations who work to organize tenants in the private market

1

to fight against mass evictions and rent increases; represent tenant associations in "expiring use" properties and public housing redevelopment projects to preserve affordable units that would otherwise be lost to the private market; advocate for state and local legislation that protects renters and spurs the construction of affordable housing in places that need it; and promote fair housing and racial justice interests in local zoning and development review processes, including and especially those heard by the Boston Planning and Development Agency (BPDA). We also maintain a robust Emergency Assistance (EA) Shelter practice, where attorneys and other advocates work (nearly always on an emergency basis) to get homeless families admitted into emergency shelters and protect those families that are threatened with unjust termination.

4. In my role as a Staff Attorney at GBLS, I maintain a docket of eviction defense cases in Housing and District Courts across Greater Boston, predominantly representing tenants from Spanish-speaking immigrant communities in our region that are threatened heavily by gentrification, including East Boston, Chelsea, and Revere. I also provide know-your-rights trainings in landlord-tenant law to community groups on a regular basis, engage in group representation (typically of tenant organizations or groups of tenants in the same building or who have the same landlord) in affirmative and defensive litigation in order to advance movement-based strategies for fighting displacement and rent hikes in gentrifying communities, and support our unit's legislative advocacy and impact work, including representing community organizations in litigation and administrative proceedings (including local zoning and development review processes) to advance policies that promote housing justice and racial equity in the housing market.

5. Recent research has laid bare the extent to which evictions and displacement are clear racial justice issues in the working-class and low-income communities of color that GBLS serves, and implicated by the Fair Housing Act to the extent that patterns of displacement ultimately result in protected classes being displaced from historically disadvantaged neighborhoods precisely as those neighborhoods begin to experience influxes of economic opportunity. <u>See generally</u> Jason Richardson, Bruce Mitchell, & Jad Edlebi, <u>Gentrification & Disinvestment 2020</u>, National Community Reinvestment Coalition (June 2020), https://perma.cc/V3PV-CCWC (finding that Boston was the third most "intensely gentrified" city in the country from 2013 to 2017, and that nationally, people of color made up seventy-seven percent of populations of "gentrifying" census tracts); <u>See</u> David Robinson, et. al, <u>Evictions in Boston: The Disproportionate Effects of Forced Moves on Communities of Color</u>, at 8 (2020), https://perma.cc/E7CJ-RJPV (finding that two-thirds of market-rate eviction filings in Boston from 2014 through 2016 occurred in in census tracts where the majority of residents are people of color, even though such neighborhoods represent only about half of the city's rental housing).

6. In response to the above trends, GBLS has increasingly been making use of fair housing arguments in our advocacy, both inside and outside of the courtroom. In our direct representation of tenants facing eviction, we have increasingly recognized that there are some circumstances that frequently occur in communities experiencing gentrification—like "building clearouts," where developers buy occupied buildings expressly intent on emptying them out and converting them to either condominiums or luxury rentals—that

2

may potentially form the basis of disparate impact claims under the Fair Housing Act and/or Massachusetts law. See generally Texas Dep't of Housing & Community. Affairs v. Inclusive Communities Project, Inc., 135 S.Ct. 2507 (2015); Burbank Apartments Tenant Assoc. v. Kargman, 474 Mass. 107 (2016) (ruling that the Massachusetts Anti-Discrimination Law, G.L. § 151B, recognizes disparate impact liability, including in circumstances where defendants' conduct is otherwise lawful).

7. As such, in my representation of tenants facing "no-fault" eviction in a tenancy-at-will or at the end of a lease term—where, in order to prevail on the issue of possession, a tenant must typically assert one or more successful counterclaims against the landlord for violation of any law related to the tenancy—I routinely screen cases for indicia of a possible disparate impact claim. See G.L. 239, § 8A; G.L. c. 151B, § 4. I especially look for any evidence that the landlord has an established policy or practice of buying multifamily properties in diverse neighborhoods and converting them from low- or middle-income rentals into luxury units or condominiums, which ultimately has the effect of making those neighborhoods whiter and/or results in the displacement of protected classes. In these situations, I routinely include counterclaims based on direct discrimination and disparate impact fair housing theories.

8. I can think of several examples in my practice where asserting a discrimination defense to eviction rooted in disparate impact theories of liability was essential to the favorable settlement I ultimately negotiated, including one matter involving a three-family building in East Boston where the "pattern and practice" facts asserted in my clients' answer and counterclaim were so compelling that they were an even clearer and stronger defense than my counterclaims for substandard housing conditions (which are the most frequently asserted in landlord-tenant matters, in my experience) and ultimately compelled the Landlord to settle the cases before trial by offering my clients three-year leases at approximately half the "fair market rent" for a two bedroom apartment in the neighborhood. In another case involving a multifamily property in Dorchester, discrimination arguments were critical to arguing that the developer's pattern and practice of condominium conversion in the neighborhood was unlawful, even as to buildings containing fewer than 4 apartments and thus not covered by state and local condo conversion protection laws. See generally St. 1983, c. 527.

9. I understand that HUD has issued a new regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule"), and I have reviewed the rule. The Final Rule would, among other things, dramatically heighten the pleading standards and lower the burden for affirmative defenses in cases brought on a disparate impact theory under the Fair Housing Act in a way that is completely inconsistent with decades of fair housing caselaw. As a result of those changes, I believe it would be unfairly and unreasonably difficult, if not outright impossible, for tenants to assert valid discrimination counterclaims in eviction cases based upon disparate impact theories, if the Final Rule is allowed to stand.

10. By curtailing the access of tenants facing no-fault eviction in Massachusetts to defenses under the Fair Housing Act based upon disparate impact theories, the Final Rule would

3

greatly harm these tenants' ability to defend against eviction, and thereby dramatically accelerate gentrification. The harm to tenants of losing their homes, and the harm to communities of color of massive displacement, is incalculable. GBLS is aware of low-income workers of color who have been forced to move away as far as Brockton and have to return daily to their jobs in Boston, causing serious disruption to their families, profound stress, and unmanageable expenses. See generally Matthew Desmond, Evicted, Poverty & Profit in the American City 296–99 (2016) (summarizing how evictions, by correlating with employment instability, loss of access to higher-opportunity neighborhoods, and devastating physical and mental health consequences, act as a driver of poverty, not just an effect).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED this 30th day of September 2020, at Boston, MA.

_____
Joseph Michalakes
Staff Attorney, Housing Unit
Greater Boston Legal Services