UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development, <br><br> Defendants. | ) ) ) ) ) ) ) ) Civil Action No. 1:20-cv-11765 ) ) ) ) ) ) ) ) ) |

## DECLARATION OF LISA OWENS

I, Lisa Owens, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by City Life / Vida Urbana ("CLVU").

2. I serve as the Executive Director at CLVU. CLVU is a 47-year-old bilingual, membership-based community organization headquartered in Boston. Our Mission is to fight for racial, social and economic justice and gender equality by building working class power through direct action, coalition building, education and advocacy. Our Vision is of a society that guarantees that each person has the right to food, housing, health care, education, meaningful employment, and the right to exist in freedom without fear of displacement or deportation.

3. In my role as Executive Director at CLVU, I oversee our organization's work to build a broad-based movement of tenants, homeowners and workers of all kinds and our efforts to provide grassroots leaders the tools to fight corporate interests that benefit from homelessness, displacement and gentrification. I also build relationships with regional and national allies to keep working class people permanently in our homes and neighborhoods.

1

CLVU's Housing Work

4. CLVU's housing work is centered on defending tenants against homelessness and fighting to protect and expand the rights of working-class renters and homeowners. Organizing efforts have included protecting low-income immigrants and families of color from displacement; protecting women over 50 from age discrimination and unnecessary eviction from affordable housing residences; providing advice, support, information, and/or referral to more than 2,100 tenant and small owner households via our English and Spanish Emergency Housing Hotlines set up in late March 2020 and; expanding language access for immigrants to participate in municipal development processes.

5. In 2007, CLVU launched the Post-Foreclosure Eviction Defense Campaign. Ever since, eviction defense has formed the thrust of our organizing strategy to halt housing displacement for working class tenants and owners. Using our "Sword and Shield" organizing strategy, we helped over 800 families reclaim their homes. We work closely with Greater Boston Legal Services (GBLS) to provide know-your-rights trainings and eviction defense to tenants, including and especially immigrant tenants, tenants of color, and those with Limited English Proficiency.

6. We advocated successfully for passage of the MA housing eviction and foreclosure moratorium to protect vulnerable residents during the COVID-19 pandemic. We also co-authored a report with researchers at the Massachusetts Institute of Technology on the disproportionate risk of eviction faced by particularly immigrants and people of color during this health crisis.[1]

7. CLVU also relies upon civil rights laws to defend and support its membership. For example, in February 2020, CLVU filed a Title VI complaint with the U.S. Department of Housing and Urban Development (HUD) that alleged inadequate language access over the course of the City of Boston's review of Suffolk Downs, the largest ever proposed development in the City's history.

8. CLVU has also assisted hundreds of Latinx individuals in becoming first-time homebuyers through an organizing campaign that exposed and reversed lending discrimination.

The Impact of the Challenged Rule on Eviction Defense

9. I understand that HUD has issued a new regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule"), and I have reviewed the rule. The Final Rule would, among other things, fundamentally alter the pleading standards and affirmative defenses in cases brought on a disparate impact theory under the Fair Housing Act. As a result of this dramatic overhaul, the Final Rule will cause significant harm to our members and client communities.

---

[1] Robinson, David & Steil, Justin, *Evictions in Boston: The Disproportionate Effects of Forced Moves on Communities of Color* (Jun. 2020), available at: https://www.bostonevictions.org.

2

10. Disparate impact discrimination is frequently employed by attorneys representing members facing eviction in East Boston, where landlords habitually "condoize" small apartment buildings by evicting local residents—who are overwhelmingly working-class immigrants or people of color—dividing up multi-family buildings, and selling the properties as high value condominiums.

11. Dozens of CLVU's members have been evicted for pretextual reasons, ranging from alleged lease violations to excessive noise, by landlords who can then proceed to market and sell units as condominiums to wealthy, White professionals.

12. Because Massachusetts state law precludes city officials from regulating properties with fewer than four units, the City's condo conversion ordinance does not protect CLVU's members, many of whom reside in triple-family homes, from pretextual eviction and displacement.

13. As a result, CLVU's members rely heavily on the 2013 disparate impact rule, which is used defensively and as a negotiation tactic to protect against evictions where landlords have exhibited a pattern and practice of condominium conversion.

The Impact of the Final Rule on Eviction Record Discrimination

1. If the Final Rule is permitted to take effect, the heightened pleading standard and novel defenses will make it virtually impossible to challenge the use of eviction records as a basis on which to deny housing to rental applicants. Although such policies are facially neutral, they have severe and damaging disparate impacts on renters of color.

2. As described in our June 2020 report, the COVID-19 pandemic has "only excacerbate[d] the disproportionate effects of evictions on communities of color." When Governor Charlie Baker signed into law a moratorium on all eviction proceedings on April 20, 2020, 78% of suspended eviction cases in Boston due to the pandemic were in communities of color. Prior to the pandemic, market-rate eviction filings in Boston correlated strongly with the neighborhood share of Black renters, with the highest eviction filing rates in the historically Black neighborhoods of Roxbury, Mattapan, Hyde Park, the South End, and Dorchester.[2]

3. CLVU is also aware that Boston-area landlords use eviction records from Housing Court, which are available for free online at MassCourts.org, to create tenant blacklists.

4. By requiring plaintiffs to demonstrate as part of their initial case—without the benefit of discovery—that a tenant screening policy is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration or requirement of law," the Final Rule prioritizes profit over fair housing. Under this standard, landlords will be able evade legal review if they can just plausibly

---

[2] *Id*. at 10, 13, 14.

     argue that there is a financial basis for their policy. Plaintiffs will also have no way of obtaining a private landlord's financial or business records to anticipate and plead facts to counter any possible defense.

5. I understand that after the pleading stage, the Final Rule creates a defense for practices that predict outcomes, such as risk analysis.

6. CLVU has learned that numerous landlords in Massachusetts use tenant screening services, such as CoreLogic, to conduct sweeping background checks on applicants.

7. Given the vague and undefined language used in the Final Rule, defendants will likely be able to argue that the use of services like CoreLogic, which automatically recommends that property owners "reject applicants with any eviction cases brought against them within the past 4 years," regardless of whether the tenant prevailed or the judgment was satisfied, operates as a complete defense to a claim of disparate impact discrimination.[3]

8. If organizations like CLVU cannot utilize the disparate impact rule to negotiate with or advocate to landlords, these property owners will be even more emboldened to deny housing to tenants with eviction histories.

9. Additionally, if there is no recourse for challenging such screening policies or tenant blacklists, tenants will be more likely to accept unlawful or unsafe conditions for fear of speaking out and being evicted, which will in turn preclude them from ever finding any rental housing.

---

[3] Duke, Annette & Park, Andrea, *Evicted for Life: How Eviction Court Records Are Creating a New Barrier to Housing*, Massachusetts Law Reform Institute (Jun. 12, 2019), at 10, available at: https://www.mlri.org/publications/evicted-for-life/.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED this 30 day of September 2020, at Boston, MA.

                                                          Lisa Owens
                                                         Executive Director
                                                      City Life/Vida Urbana