UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development, <br><br> Defendants. | Civil Action No. 3:20-cv-11765 |

## **DECLARATION OF DINANYILI PAULINO**

I, Dinanyili Paulino, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by the Chelsea Collaborative ("the Collaborative").

2. I serve as the Chief Operating Officer at the Collaborative. The Collaborative empowers Chelsea residents to enhance the social and economic health of their community and their people and to hold institutional decision makers accountable to the community. We are a membership-based organization built, enriched, and sustained by Latinos, immigrants, refugees, workers, and youth, who bear the burden of injustice. Through 31 years of community empowerment initiatives, we have developed a strong base of engaged and informed members prepared to mobilize others and effect change. Together, we have elected a city council and school committee that reflect the diversity of our residents; built citywide systems and policies to welcome and support immigrants; and changed the course for thousands of youth through opportunities and positive development

3. In my role as Chief Operating Officer at the Collaborative, I oversee the organization's financial and development departments and provide supervision and support for our program directors.

The Collaborative's Housing Work

1

4. The Collaborative's housing work is centered on preventing displacement. We provide free to support to families applying for rental assistance programs, host educational workshops on tenants' rights when facing eviction proceedings, and engage in advocacy campaigns to expand access to affordable housing and to protect the rights of Chelsea tenants, particularly Latino immigrants.

5. One of our most successful programs is the Chelsea Tenants' Association (CTA), a committee of tenants and homeowners dedicated to ensuring that all people have access to quality, affordable housing. CTA uses direct action, education, mutual support, and legal advocacy to end foreclosures and predatory lending, to fight housing discrimination and unjust evictions, and to advocate for quality, affordable housing.

6. In the past several years, CTA has accomplished the following:

    a. Prevented the eviction of hundreds of Chelsea families following the 2007-08 financial crisis;
    b. Worked in two statewide coalitions, the Massachusetts Alliance Against Predatory Lending and NEWROAD, to coordinate strategy and tactics and provide support to each other in the fight for principal reduction and against post-foreclosure evictions;
    c. Established a strong partnership with the City of Chelsea and The Neighborhood Developers to fix housing code violations and identify properties that might be purchased and remodeled to become permanent affordable housing;
    d. Successfully advocated for the expansion of Massachusetts' Housing Court, including the opening of a new Housing Court in Chelsea, and providing ongoing monitoring of housing issues in the Chelsea District Court;
    e. Provided mediation for tenants in 58 housing cases;
    f. Worked with Greater Boston Legal Services (GBLS) to oversee the Innes Apartment construction project to protect public housing tenants; and
    g. In response to the COVID-19 pandemic, worked with city and state officials to expand access to hotel quarantine options, expand resources for rental assistance programs, advocate for rental amnesty, and expand access to legal counsel for tenants facing eviction.

<u>The Impact of the Challenged Rule on the Collaborative and its Members</u>

7. I understand that HUD has issued a new regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule"), and I have reviewed the rule. The Final Rule will cause significant harm to our members if it is permitted to come into effect.

8. The idea of disparate impact theory as expressed in the 2013 rule—that policies or practices that appear facially neutral but have disparate impacts on protected groups are unlawful—animates much of the Collaborative's and CTA's organizing, strategizing, movement-building, and legal advocacy.

9. For example, in 2013, CTA launched a campaign against predatory rent increases and evictions by City Realty, which had purchased eighteen foreclosed buildings in Chelsea over the past two years. CTA identified legal support for all of the tenants, the vast majority of whom were low-income, Latino, Spanish-speaking and from immigrant families, and increased the presence of court solidarity teams. The campaign, and the legal arguments advanced by attorneys, emphasized that City Realty's actions were unlawful because of their disparate impact on immigrant and Latino residents.

10. The campaign was an enormous success: 100% of the evictions were stopped and, by the end of 2013, three apartment buildings provided all tenants with year-long leases with no rent increase.

11. Without the availability of disparate impact theory, I believe our organization would not have been nearly as successful in its advocacy. Absent the threat of litigation, City Realty would have had no incentive to cease its predatory and discriminatory practices that, while neutral on their face, were having a disproportionate impact upon Chelsea's most vulnerable residents.

12. The Collaborative's members also work closely with legal advocates at organizations like GBLS, Suffolk University's Legal Aid Program, and Lawyers for Civil Rights (LCR), who provide representation and advice for homeowners and tenants.

13. For example, in July 2020, the Collaborative, after consulting with a legal partner, was able to negotiate with a landlord who denied an apartment to a member without a social security number. In particular, the Collaborative informed the landlord that the practice had a disproportionate impact upon undocumented and immigrant residents and that other options for performing credit checks or demonstrating proof of income or employment were available, which prompted the resolution.

14. However, if property managers and landlords believed they could not be held responsible in court for unlawful practices, they would refuse to negotiate with us. Our members would be unable to challenge, informally or formally, the policies and practices that restrict their housing choice.

15. Similarly, the Collaborative also routinely partners with GBLS and LCR to provide know-your-rights trainings on topics pertaining to housing and lending discrimination. Members have relied and continue to rely on the availability of disparate impact theory— the idea that they, with their lawyers, can hold someone accountable for policies that seem neutral but have a disproportionate impact—as a critical tool in advocating for themselves and their families.

16. Through this self-advocacy, members are able to resolve issues without having to go to court. However, if property owners cannot be found liable for their misconduct, the Collaborative is deeply concerned they will stop negotiating with our members and instead, implement discriminatory policies with impunity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED this 25 day of September 2020, at Chelsea, MA

_____
Dinanyili Paulino
Chief Operating Officer
Chelsea Collaborative

4