UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC., <br><br>Plaintiffs, <br><br>v. <br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development, <br><br>Defendants. | Civil Action No. 3:20-cv-11765 |

## DECLARATION OF BRENDA TORPY

I, Brenda Torpy, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by the Champlain Housing Trust ("CHT").

Champlain Housing Trust

2. I serve as the CEO of CHT, a membership-based nonprofit that creates and preserves affordable housing in northwest Vermont. Founded in 1984, CHT is the largest community land trust in the United States. We manage 2,400 apartments and steward 630 owner-occupied homes in our signature shared-equity program, offer homebuyer education and financial fitness counseling, provide services to five housing cooperatives, and offer affordable energy efficiency and rehabilitation loans.

3. Our Mission is to support the people of northwest Vermont and strengthen their communities through the development and stewardship of permanently affordable homes and related community assets. Our Vision is that the communities of Northwest Vermont will be diverse and inclusive with safe, decent, affordable, and attractive housing choices for all people. In 2008, CHT was awarded the United Nations World Habitat Award for our innovative, sustainable programming.

4. In direct response to COVID-19, CHT launched the Re-Housing Recovery Program, which provides grants to property owners to rehabilitate vacant and distressed apartments

1

     to increase available affordable rental housing, particularly for vulnerable and homeless households impacted by COVID-19. Additionally, CHT is purchasing a motel and creating 68 new affordable apartments in Essex Junction, Vermont for households experiencing homelessness.

5. CHT develops new, and preserves existing, affordably priced housing, including resale-restricted homes, multi-family rental apartments, and limited equity cooperative homes. We also develop service-enriched and transitional housing, commercial spaces, community facilities, community parks, and other nonresidential amenities that provide a foundation for strong, vital communities. We also offer a lending program to serve individuals unable to access traditional financing.

6. CHT's historic target area is the City of Burlington's Old North End, the region's largest concentration of poverty and Vermont's most multicultural area with a large population of New Americans and refugees. CHT has a significant amount of housing in the Old North End, a neighborhood that has historically suffered from aging, substandard housing stock, and periods of neglect and disinvestment.

7. There are a large number of immigrant and refugee individuals and families in our housing. In CHT's affordable apartments, roughly 63% of our residents are White, 25% are Black or African American, 8% are Asian, and 2% are American Indian or Alaskan Native. By contrast, Vermont's population is 94.2% White. In CHT's affordable shared equity homes, 86.4% of our homeowners are White, compared to 97.2% of all homeowners.

8. In my role as CEO at CHT, I primarily work with community leaders to advance our mission, and provide leadership and support to CHT's 110 staff members. Prior to joining CHT in 1991, I worked in a variety of jobs in the housing field, including at the Vermont Housing Finance Agency, the City of Burlington and a community action agency.

The Impact of the Challenged Rule on CHT and its Members

9. I understand that the U.S. Department of Housing and Urban Development has issued a new regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule"), and I have reviewed the rule.

10. The Final Rule will undermine the broad remedial goals of the Fair Housing Act to eviscerate segregation, promote housing choice, and provide equal access for all to safe, affordable homes. In particular, the effect of the Final Rule, coupled with the recent rollback of the Affirmatively Furthering Fair Housing Rule, will preclude advocates from negotiating with or bringing legal challenges against municipalities that adopt zoning policies that impede multifamily development.

11. As outlined in CHT's Strategic Plan for 2020-2022, the cumulative impact of restrictive zoning practices presents a serious challenge to our housing work, as in Vermont, the use of inclusionary zoning by a municipality is purely optional.

12. It is exceedingly difficult, if not impossible, for CHT to develop new, multi-family housing to meet the needs of our members in cities and towns that employ restrictive zoning practices, including but not limited to excessive restrictions on the location and allowed density of multi-family housing, including both new housing and conversion of extant single-family to multi-family units, unreasonable or costly requirements for the siting, layout and design of new or expanded mobile home parks, and large minimum lot sizes and low densities of residential development.

13. On several occasions, even though CHT was able to build multifamily housing, the project was severely delayed and the organization was forced to decrease the allowed density, both of which resulted in higher costs. These include Harrington Village in Shelburne, Vermont, a wealthy suburb of Burlington; O'Dell apartments in South Burlington, an inner core suburb; and South Meadow Apartments in Burlington proper. Together, these three examples account for 250 affordable homes in a very tight and high-cost housing market area.

14. Lengthy and unpredictable permitting processes have also posed a major impediment to our development of affordable housing. Some projects can be halted simply by the objection of one neighbor. Recently, opposition to a 750-home multifamily, mixed income, intergenerational development was stalled by one neighbor who felt he had rights to the "viewshed" across the road from him—even after three years of planning and public process. On another occasion, our restoration of a former boarding house in the heart of Burlington to house single women experiencing homelessness was held up by a single neighbor and CHT was forced to expend time and resources to challenge him in court.

15. Local zoning codes allow protection of the "character" of neighborhoods or communities as a criterion, as does our state zoning overlay, Act 250. This notion of "character" is often used a proxy for discrimination. One local community forced a phased-in development of recovery housing for people with substance use disorder because of unfounded fears. Another community in Northwest Vermont unsuccessfully attempted to use restrictive zoning to claim that people who were homeless were not members of the general public in order to prevent them access to housing and services in their town.

16. These permitting and zoning practices restrict housing choice, ensuring that low-income renters or mobile park residents—who overwhelmingly belong to classes protected under the Fair Housing Act—are clustered in small areas. To that end, these practices increase and perpetuate segregative housing patterns.

17. Advocates like CHT and our partners rely on disparate impact theory, and the powerful language of the Supreme Court in *Inclusive Communities*, to push back against towns and cities that seek to curb the development of multifamily, affordable housing or mobile home parks. If the Final Rule takes effect, more municipalities will press ahead with restrictive zoning and permitting practices, directly inhibiting CHT's Mission, Vision,

and Strategic Plan of building additional affordable units throughout Northwest Vermont to serve and support its members.

18. In addition, I have seen firsthand that property owners engage in housing discrimination throughout Vermont. In my lengthy experience at CHT, coupled with hundreds of intakes with clients and conversations with community partners, I have seen numerous examples of housing discrimination that appears facially neutral but has a disproportionate effect on one or multiple protected classes. For example, we have repeatedly seen the denial of rental applications to immigrants and refugees due to poor or no credit, even though their country of origin had a different credit reporting structure.

19. Landlords across Northwest Vermont have used economic incentives and the high costs of an eviction proceeding to justify their reliance on discriminatory policies, such as automatic rejections of anyone named in an eviction case, and eviction or nonrenewal of lease for tenants who are abused by a spouse or partner.

20. We have assisted rental applicants in challenging these policies, as well as directed them to other legal resources, on the grounds they are violative of the Fair Housing Act on a theory of disparate impact. However, if disparate impact claims are unavailable, our most vulnerable communities would receive far less protection, leaving property owners and managers emboldened to engage in discrimination.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED this 23rd day of September 2020, at Chittenden.

*Brenda M Torpy*
Brenda M Torpy (Sep 23, 2020 06:39 EDT)

Brenda Torpy
Chief Executive Officer
Champlain Housing Trust