UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. 3:20-cv-11765 |

## **DECLARATION OF DWAIGN TYNDAL**

I, Dwaign Tyndal, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge and business records kept by Alternatives for Community and Environment ("ACE").

2. I serve as the Executive Director of ACE. ACE is a membership-based, environmental justice, and transit-oriented development nonprofit that organizes residents of Roxbury in Boston, Massachusetts to build platforms and offer resources to address systemic injustice. Our Mission is to build the power of communities of color and low-income communities in Massachusetts to eradicate environmental racism and classism, create healthy, sustainable communities, and achieve environmental justice. ACE defends the rights of all communities that have been traditionally discriminated against and that have been defined as protective classes federally and in Massachusetts.

3. In my role as Executive Director at ACE, I primarily oversee staff work on a variety of issues at the intersection of public health and the environment, including fair housing, transit justice, and clean energy. Prior to joining ACE, I was the Director of Policy and Community Outreach at the Fair Housing Center of Greater Boston for over three years. In that capacity, I did education and outreach regarding fair housing in general and the obligation of municipalities to affirmatively further fair housing. The trainings on affirmatively furthering fair housing targeted municipalities. I also participated in court mandated trainings for property management companies and realtors.

ACE'S Fair Housing and Environmental Justice Work

4. ACE is a longstanding member of the Community Advisory Committee for the Assessment of Fair Housing and has worked for years to hold the City of Boston accountable for the lack of fair housing in Roxbury and throughout the City.

5. ACE's Environmental Justice Legal Services program anchors ACE's organizational and coalition work with a robust legal framework grounded in federal and state civil rights and environmental laws, including and especially the Fair Housing Act. Our Staff Attorney collaborates with all staff and members to ensure that legal arguments and campaigns are grounded in both the law and the lived experiences of staff and community members.

6. ACE staff actively participate in legislative and regulatory advocacy locally and statewide on fair housing issues.

7. ACE is a member of the Right to the City Alliance, a nationwide alliance of racial, economic, and environmental justice organizations that provides a unified response to gentrification and a call to halt the displacement of low-income people, people of color, marginalized LGBTQ communities, and youths of color from their historic urban neighborhoods.

8. Over the last five years, ACE has served as resource and offered space to the activists and organizers involved in Reclaim Roxbury, a broad-based community effort dedicated to improving the quality of life and economic wealth for all Roxbury residents. ACE staff regularly attend Reclaim Roxbury meetings and support Reclaim's calls for a community-led planning process and a Roxbury in which residents have a voice in deciding how their needs for housing and a thriving community are met.

9. ACE routinely receives intake calls from Roxbury community members alleging practices, policies, or conduct that constitutes disparate impact discrimination. For example, callers will describe landlords who will not rent to families with children or who reject applicants based on their receipt of Section 8 and other housing subsidies.

10. ACE is also gravely concerned about the ongoing targeting of low-income communities of color for predatory payday loans, subprime loans, and reverse mortgages.

The Prevalence of Housing Discrimination in Boston and the Need for Disparate Impact

11. Although extant civil rights and housing laws prevent facial or outright discrimination, to this day, a combination of entrenched policies, practices, and attitudes operate to exclude and segregate communities of color.

12. Greater Boston is one of the most segregated metropolitan areas in the entire country. According to a June 2019 report, "[m]ore than 70 percent of the region's Latino households and 66 percent of black households resided in just 10 municipalities in

2017."[1] The report goes on to note that "few concrete actions" have been undertaken by state or local policymakers to "reverse the legacy of discriminatory federal, state, and municipal" housing policies.[2]

13. To provide a specific example, affluent communities in Greater Boston have zoning ordinances that exclude the development of multifamily housing projects, thereby "perpetuat[ing] current patterns of racial and income segregation."[3] Because of Massachusetts' policy of "home rule," in which individual municipalities may determine their own zoning and housing policies, the state is unable to take significant action to desegregate communities, such that advocates are left to legal action under civil rights laws like the Fair Housing Act to push for dense or multifamily development.

14. The report went as far as to call for "strong enforcement of state and federal fair housing and antidiscrimination laws"—including "[n]onprofit legal advocacy"—to combat inequity in access to housing, noting that communities will regularly render permitting decisions or propose zoning changes that "effectively prohibit rental housing for families with children, which also has the effect of exclusion by income and race."[4]

15. Over the course of my time at ACE, as well as at the Fair Housing Center of Greater Boston, I have seen numerous examples of discriminatory conduct on the part of developers, municipal officials, landlords, property management companies, and lenders, including realtors steering potential buyers of color away from majority-white neighborhoods or landlords openly posting on Craigslist and other websites that applicants may not receive Section 8 vouchers, have a credit score under 650, or have a prior eviction or claim for non-payment of rent. Although this discrimination is not overt—that is, individuals do not voice an intent to discriminate against members of a protected class—the policies or practices involved have a significant disproportionate effect upon communities of color.

16. The ongoing existence of discriminatory housing policies and practices, coupled with the skyrocketing of rental prices in Greater Boston, the lack of new affordable housing, and the COVID-19 pandemic, show the need for greater, not fewer, fair housing protections in order to protect vulnerable residents in communities like Roxbury and across the country.

<u>The Environmental Justice Consequences of the Challenged Rule</u>

17. I understand that HUD has issued a new regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule"), and I have reviewed the rule. The Final Rule would, among other things, fundamentally alter the pleading standards and affirmative

---

[1] The Boston Foundation et al., *The Greater Boston Housing Report Card 2019: Supply, Demand, and the Challenge of Local Control* (Jun. 2019), at 6, available at: https://www.tbf.org/-/media/tbf/reports-and-covers/2019/gbhrc2019.pdf?la=en&hash=6F5C3F0B829962B0F19680D8B9B4794158D6B4E9
[2] *Id*. at 67.
[3] *Id*.
[4] *Id*. at 87.

3

defenses in cases brought on a disparate impact theory under the Fair Housing Act. As a result of that change, I believe the Final Rule has caused and will continue to cause significant harm to our membership and the communities we serve, especially in the context of environmental justice.

18. As the first environmental justice nonprofit organization in Massachusetts, ACE has fought for years to draw attention to the relationship between housing and environmental discrimination. The experiences of our members reveal that the zipcode in which individuals live determines the likelihood that they will contract or be hospitalized for asthma, or that they will be exposed to lead contamination in their schools or homes. In Roxbury, for example, a neighborhood that is 89% non-White, children are hospitalized for asthma-related complicated at a rate nearly six times higher than the national average.[5]

19. As a result of the Supreme Court's *Sandoval* decision in 2001, ACE and ACE's members' ability to litigate claims relating to disparate impacts in an environmental justice context has been all but impossible. We are gravely concerned that a change to the 2013 rule would have similar impacts in the housing context. ACE is currently part of a coalition that is pushing for civil rights legislation that would allow individual plaintiffs to pursue disparate impact related claims in state court.

20. In recognizing that discrimination can take multiple forms, manifesting in patterns of behavior or discrete policies, the U.S. Department of Housing and Urban Development's 2013 rule was a critical tool for advocates like ACE.

21. The rule's relevance and impact stretched far beyond court cases. For the past seven years, ACE and its members have relied upon the 2013 rule in negotiating with potential defendants, including but not limited to large-scale property developers, permitting and licensing boards, and individual landlords, on behalf of affected individuals.

22. By overhauling the disparate impact rule, in a manner that goes far beyond the Supreme Court's decision in 2015, the Final Rule will deprive ACE and its members of a necessary and relied-upon mechanism for addressing housing and environmental discrimination.

23. The burdensome requirements upon plaintiffs in making out a *prima facie* case will preclude the raising of any claims of environmental racism. For example, in order for advocates to bring a lawsuit under the Final Rule for discrepancies in access to the City's water supply based on race and neighborhood, they will be forced to anticipate and provide facts to counter the range of "valid interest[s] or legitimate objective[s]" that the City could raise—without the benefit of discovery. This task is made near-impossible by the existence of the deliberative process exemption, which precludes the use of public records laws to obtain memoranda and letters relating to policy positions being developed by an agency.

---

[5] Boston Planning & Development Agency Research Division, *Neighborhood Profiles* (Apr. 2019), available at: http://www.bostonplans.org/getattachment/f719d8d1-9422-4ffa-8d11-d042dd3eb37b.

24. The Final Rule's heightened causality requirements, which stand in stark contrast to the Fair Housing Act's broad remedial purpose, will leave individuals suffering the effects of environmental racism without redress for injuries caused by cumulative actions, such as the continuous siting of toxic facilities and environmental hazards in low-income communities of color.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED this 22 day of September 2020, at 5:13.

_____
Dwaign Tyndal
Executive Director
Alternatives for Community and Environment