UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON, Secretary of the Department of Housing and Urban Development, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 3:20-cv-11765 |

## DECLARATION OF TED WIMPEY

I, Ted Wimpey, upon my personal knowledge, and in accordance with 28 U.S.C. § 1746(2), declare as follows:

1. I am over the age of eighteen. This declaration is made based on my personal knowledge.

2. I am the former director of the Champlain Valley Office of Economic Opportunity (CVOEO) Fair Housing Project (FHP), a position I held for over twelve years before my retirement in July 2019. Headquartered in Burlington Vermont, the FHP works primarily on mitigating or eliminating systemic issues that limit fair housing choice in Vermont through education, outreach, and referral services, in close partnership with Vermont's Department of Housing and Community Development, Vermont's Human Rights Commission, Vermont Legal Aid, the City of Burlington's Community and Economic Development Office, and numerous non-profit and private for-profit residential development companies. The FHP has provided consultation and support for municipal planning commissions and housing policy development committees. The FHP also works with tenant advocacy and information programs such as Vermont Tenants, which is also housed in the CVOEO.

3. I understand that the U.S. Department of Housing and Urban Development has issued a final regulation on the disparate impact provisions of the Fair Housing Act (the "Final Rule") and I have reviewed the rule.

4. The Final Rule erects numerous barriers to the bringing of disparate impact claims, which are essential to the enforcement of fair housing laws.

5. In my years with the FHP, we encountered two primary forms of housing discrimination prohibited by the 2013 Fair Housing Act.

6. First, the FHP assisted hundreds of individuals and families who had been the victims of illegal housing discrimination based on their membership in one or more protected classes. I have seen firsthand that landlords and property managers engage in housing discrimination throughout Vermont. In my lengthy experience at the FHP, coupled with hundreds of intakes with clients and conversations with community partners, housing discrimination in Vermont is rarely overt, but instead, is subtle, unspoken, or cumulative. Examples include:

    a. Young applicants of color in Chittenden County who felt the need to use a false name to avoid profiling by landlords, as applicants with culturally-specific, non-English sounding names have reported outright rejection.
    b. Refugees and immigrants who had been denied housing based on their accents, or whose calls to landlords go unanswered and unreturned. Clients reported that landlords will cite poor or no credit as a reason for rejection, but that these are often pretextual.
    c. Blanket policies that denied applications from those who have a criminal record, or are emerging from incarceration.
    d. Landlords regularly sharing information with one another regarding previous tenants and searching publicly available court records to access a tenant's previous rental and eviction history and automatically declining applications from any tenant who was named in an eviction case.

7. Second, the FHP contended with a subtle, but no less pernicious form of housing exclusion: a broad pattern of exclusionary zoning measures. These include, but are not limited to, limitations on multi-family development, which in turn excludes renters, especially low-income renters who are disproportionately people of color. These individuals are therefore clustered in a few areas in Vermont, thereby perpetuating segregation and limiting housing and economic opportunity.

8. In addition, multiple Vermont cities and town impose excessively restrictive regulations for residential housing and community development. These can include excessively large lot size requirements for housing development, excessively low maximum density requirements, unnecessarily wide setback requirements for housing fronting on sidewalks and municipal streets, and excessive parking requirements for new developments. These restrictions drive up housing costs, effectively shutting out low-income residents of color and immigrant residents.

9. Taken together, these policies and practices had considerable harmful disparate impacts on housing opportunity for racial and ethnic minorities, individuals with disabilities, women and families with young children, and other protected classes. These harms were not limited to just these individuals, but could be generational in their impact—for example, a family unable to access a mortgage with favorable terms was unable to build generational wealth through the purchase of a home.

10. Although the FHP and other advocates have been able to convince many local governments to introduce residential development practices that will open up communities—such as in South Burlington and Winooski—those efforts will be seriously curtailed if cities and towns do not see such reforms as part of their obligation to eliminate policies with a disparate impact on protected classes.

11. Absent enforcement mechanisms that clearly recognize disparate impact as a real and harmful violation of federal fair housing law, municipalities will have no incentive to implement housing policies that undo or address decades of institutionalized racism and segregation.

12. Many of the entities reported to the FHP, ranging from landlords to property managers to development review boards, cited high costs as their justification for discrimination. For example, landlords who employed blanket policies excluding apartment applicants with an eviction record would argue that such applicants were more likely than others to violate their lease, which would in turn require an expensive court eviction process.

13. The Final Rule incorporates and adopts these rationales, allowing defendants to evade liability if they can demonstrate that their actions were motivated by profit or business considerations. If the Final Rule is permitted to come into effect, it will be essentially impossible to hold these actors accountable for their discriminatory conduct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

DATED this  21   day of September 2020, at 10:45 AM

*Ted Wimpey*
_____
Ted Wimpey
Former Director
Champlain Valley Office of Economic Opportunity Fair Housing Project