**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MASSACHUSETTS FAIR HOUSING CENTER and HOUSING WORKS, INC.**, <br><br> *Plaintiffs*, <br><br> vs. <br><br> **UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BEN CARSON**, Secretary of the Department of Housing and Urban Development, <br><br> *Defendants*. | No. 1:20-cv-11765-MGM |

<u>**NATIONAL CONSUMER LAW CENTER'S AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION UNDER 5 U.S.C. § 705**</u>

The National Consumer Law Center ("NCLC") submits this amicus brief in support of Plaintiffs' Massachusetts Fair Housing Center and Housing Works, Inc. motion for an order under 5 U.S.C. § 705 postponing the effective date of a rule issued by defendant Department of Housing and Urban Development ("HUD"), Implementation of the Fair Housing Act's Disparate Impact Standard, 85 Fed. Reg. 60288 (September 24, 2020) (the "2020 Rule"), and for a nationwide preliminary injunction barring HUD from implementing the 2020 Rule until the Court has determined whether the 2020 Rule is valid. NCLC, as an expert in mortgage financing in general and specifically in issues of mortgage discrimination, focuses its attention herein on the impact the 2020 Rule would have on the effective enforcement of the Fair Housing Act on behalf of African American and Hispanic mortgagors.

HUD's 2020 Rule would severely weaken disparate impact liability under the Fair Housing Act and undermine robust enforcement of this important civil rights statute. The

1

disparate impact rule serves to remedy severe, systemic discrimination that denies individuals access to credit, affordable housing, insurance and other services. In its current form, HUD's disparate impact rule has been used effectively and consistently to challenge housing discrimination. The 2020 Rule upends this progress without justification and, therefore, should be stayed pending a full and thorough analysis by this Court.

## I.      NCLC Statement of Interest

NCLC is a national research and advocacy organization focusing on justice in consumer financial transactions, especially for low income and elderly consumers. Since its founding as a nonprofit Massachusetts corporation in 1969, NCLC has been a resource center addressing numerous consumer finance issues affecting equal access to fair credit in the marketplace.

NCLC publishes a 21-voulume Consumer Credit and Sales Legal Practice Series, including Credit Discrimination, Seventh Ed. (2018). NCLC also provides legal and technical consulting and assistance on consumer law issues to legal service, government, and private attorneys representing low-income consumers across the country.

NCLC attorneys have written and advocated extensively on all aspects of consumer law affecting low-income people, conducting trainings for tens of thousands of legal services and private attorneys, and provided extensive oral and written testimony to numerous Congressional committees on various topics. In addition, NCLC attorneys regularly provide comprehensive comments to federal agencies, including HUD, on the regulations under consumer laws that affect low-income consumers. Specifically, NCLC submitted comments in response to HUD's Request for Comments to Implementation of the Fair Housing Act's Disparate Impact Standard on October 18, 2019.

**II.     Disparate Impact is a vital tool for remedying historical mortgage discrimination lending practices that fueled subprime mortgage lending and contributed to the recent foreclosure crises.**

The recent foreclosure crisis, which continues to batter communities across the country in the midst of the current pandemic, was precipitated and exacerbated by widespread abuses on the part of subprime lenders. These abuses were inextricably linked to racial discrimination. A history of lending discrimination created lasting disparities in access to credit opportunities, leaving a vacuum in predominantly African American and Latino communities that was filled by subprime specialists who operated without competition. Subprime lenders set up alternative business channels, through which minority communities had access only to the riskiest and most expensive loan products. Recipients of those products, in turn, faced a severely increased risk of foreclosure. Rigorous economic and statistical analyses have repeatedly shown that racial disparities appear even when holding income and creditworthiness constant – in other words, minority borrowers received riskier loan products than similarly situated whites, leaving minority communities with significantly higher rates of foreclosure.

A. Discriminatory Subprime Lending Was a Major Cause of the Foreclosure Crisis

1. Roots of Subprime Lending

Over the last two decades, many subprime lenders engaged in predatory practices, charging excessive fees, imposing overly risky terms, and frequently layering multiple risks in a single transaction. The impact of these practices has fallen disproportionately on minority borrowers. Subprime lenders marketing to minority communities exploited the absence of conventional lending institutions, which was the product of a history of housing discrimination. See, e.g., U.S. Dep't of Hous. & Urban Dev. & U.S. Dep't of the Treasury, Curbing Predatory Home Mortgage Lending 18, 47-49 (2000) [hereinafter Curbing Predatory Home Mortgage

Lending]; Jacob S. Rugh & Douglas S. Massey, Racial Segregation and the American Foreclosure Crisis, 75 Am. Soc. Rev. 629, 630-31 (2010).

The historical roots of contemporary disparities in access to credit can be traced to the 1930s, when the federal government developed a rating system purporting to assess risks associated with lending in specific neighborhoods. On rating system maps, integrated or predominantly black neighborhoods were marked in red. See Jeremiah Battle, Jr, , Credit Discrimination (7th ed. 2018); Douglas S. Massey, Origins of Economic Disparities: The Historical Role of Housing Segregation, in Segregation: The Rising Cost for Americans 40, 69-73 (James H. Carr & Nandinee K. Kutty, eds., 2008). Loans were virtually never made in these "redlined" communities. Massey, Origins of Economic Disparities, supra, at 69. Federal courts have long recognized that the practice of redlining – i.e., basing refusals to extend credit on the racial composition of neighborhoods – violates the Fair Housing Act. See, e.g., Nationwide Mutual Ins. Co. v. Cisneros, 52 F.3d 1351, 1359-60 (6th Cir. 1995); Laufman v. Oakley Bldg. & Loan Co., 408 F. Supp. 489, 493 (S.D. Ohio 1976).

Even though redlining was found to be illegal, credit opportunities remained scarce in African American and Latino communities throughout the 1970s and 80s. See Kathleen C. Engel & Patricia A. McCoy, From Credit Denial to Predatory Lending: The Challenge of Sustaining Minority Homeownership, in Segregation: The Rising Costs for Americans, supra, at 81, 85.

A series of Pulitzer Prize-winning newspaper articles examining lending practices in Atlanta during the 1980s illustrated the persistence of neighborhood-based racial discrimination. The investigation found that "[r]ace – not home value or household income – consistently determine[d] the lending patterns of metro Atlanta's largest financial institutions," and that "[a]mong stable neighborhoods of the same income, white neighborhoods always received the

most bank loans per 1,000 single family homes," while black neighborhoods "always received the fewest." Bill Dedman, Atlanta Blacks Losing in Home Loans Scramble, Atlanta Journal-Constitution, May 1, 1988, at A1. Similarly, a study by the Federal Reserve Bank of Boston found that, even after controlling for creditworthiness, blacks and Hispanics were more likely than whites to be turned down for credit. Alicia H. Munnell et al., Mortgage Lending in Boston: Interpreting HMDA Data, 86 Amer. Econ. Rev. 25, 26 (1996).

Redlining, and the disparities in access to credit it created, set the stage for new forms of discriminatory lending arising in the 1990s and cresting in the years leading up to the 2008 financial crisis. As the 1990s progressed, the advent of subprime lending and mortgage securitization created the tools and incentives that led subprime specialists to focus on communities previously denied access to conventional credit. Subprime products "originally were extended to customers primarily as a temporary credit accommodation in anticipation of early sale of the property or in expectation of future earnings growth." Statement on Subprime Mortgage Lending, 72 Fed. Reg. 37569-01 (Dep't of the Treas. et al. June 28, 2007).

Lenders intensified these unscrupulous practices in response to explosive demand from financial firms that bundled subprime mortgages into securities products. See, e.g., Adkins v. Morgan Stanley, -- F.3d --, 2013 WL 3835198, at *2 (S.D.N.Y. July 25, 2013); see also Kathleen C. Engel & Patricia A. McCoy, The Subprime Virus: Reckless Credit, Regulatory Failure, and Next Steps 56-58 (2011). In contrast to traditional lending – where banks held onto mortgages, bearing the risk and reward of payment obligations for the life of the loan – securitization allowed lenders to quickly dispose of loans, selling them to investment banks (which, in turn, sold investment interests in large pools of loans). Engel & McCoy, Subprime Virus, supra, at 40-41; see also William Apgar & Allegra Calder, The Dual Mortgage Market: The Persistence of

Discrimination in Mortgage Lending, in The Geography of Opportunity: Race and Housing Choice in Metropolitan America 101, 104 (Xavier De Souza Briggs, ed., 2005). This process allowed lenders to rapidly replenish their funds, enabling a cycle of origination, sale, and securitization. Because these loans could be quickly sold, and because the secondary market incentivized origination of loans with the riskiest terms over prime loans, lenders changed their focus from quality to quantity, emphasizing volume in risky loans that generated the largest profits. Engel & McCoy, The Subprime Virus, supra, at 28-29, 32-33. "Rather than simply search for the best loan product for the customer," the secondary market created incentives to "'push market' particular products to the extent that the market [would] bear." Ren S. Essene & William Apgar, Joint Ctr. for Hous. Studies, Harvard Univ., Understanding Mortgage Market Behavior: Creating Good Mortgage Options for All Americans 8 (2007) (citation omitted). For these reasons, the "invention of securitized mortgages . . . changed the calculus of mortgage lending and made minority households very desirable as clients." Rugh & Massey, supra, at 631.

  2. <u>Subprime Lending Practices Resulted in Widespread Racial Disparities</u>

  The subprime lending boom and race were inextricably linked from the outset. A joint report from the U.S. Department of Housing and Urban Development (HUD) and the U.S. Department of the Treasury found that as of 2000, "borrowers in black neighborhoods [were] five times as likely to refinance in the subprime market than borrowers in white neighborhoods," even when controlling for income. Curbing Predatory Home Mortgage Lending, supra, 47-48. Moreover, "[b]orrowers in upper-income black neighborhoods were twice as likely as homeowners in low-income white neighborhoods to refinance with a subprime loan." Id. at 48; see also Stephen L. Ross & John Yinger, The Color of Credit: Mortgage Discrimination, Research Methodology, and Fair- Lending Enforcement 24-25 (2002) (summarizing research on

minority access to credit). In effect, a dual mortgage market took root, such that different communities were offered "a different mix of products and by different types of lenders," and subprime lenders "disproportionately target[ed] minority, especially African American, borrowers and communities, resulting in a noticeable lack of prime loans among even the highest-income minority borrowers." Apgar & Calder, supra, at 102.

Other studies uncovered stark racial disparities as subprime lending expanded. One study found that, within the subprime market, "borrowers of color . . . were more than 30 percent more likely to receive a higher-rate loan than white borrowers, even after accounting for differences in risk." Debbie Gruenstein Bocian et al., Ctr. for Responsible Lending, Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages 3 (2006). Another study found that African Americans and Latinos were much more likely to receive subprime loans, and that "the disparities were especially pronounced for borrowers with higher credit scores." Debbie Gruenstein Bocian et al., Ctr. for Responsible Lending, Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures 5 (2011). That study also found "evidence that higher- rate loans were often inappropriately targeted: as many as 61 percent of borrowers who received subprime loans had credit scores that would have enabled them to qualify for a prime loan." Id. at 17 (citation omitted). These practices also meant that "borrowers in minority groups were much more likely to receive loans with product features associated with higher rates of foreclosure," i.e., loans with higher interest rates or with risky terms, like ballooning interest rates. Id. at 21. These high disparities persisted even after controlling for credit score. Id.

Disparities in subprime lending have led to high levels of foreclosure among borrowers of color, devastating black and Latino communities. As of 2010, "African Americans and Latinos [were], respectively, 47% and 45% more likely to be facing foreclosure than whites."

Debbie Gruenstein Bocian et al., Ctr. for Responsible Lending, Foreclosure by Race and Ethnicity 10 (2010). These disparities persist even within income categories. Id. at 9-10. The Center for Responsible Lending estimates that "the spillover wealth lost to African-American and Latino communities between 2009 and 2012 as a result of depreciated property values alone will be $194 billion and $177 billion, respectively." Id. at 11; see also James H. Carr et al., Nat'l Community Reinvestment Coal., The Foreclosure Crisis and Its Impact on Communities of Color: Research and Solutions 31 (Sept. 2011) (discussing the racial wealth gap).

Examined in the aggregate, the connection between race, subprime lending, and foreclosures is starkly apparent. Researchers at Princeton University, for example, studied the relationship between neighborhood racial composition, subprime lending, and foreclosure rates, and found strong statistical links. See Rugh & Massey, supra, at 644. "Simply put, the greater the degree of Hispanic and especially black segregation a metropolitan area exhibits, the higher the number and rate of foreclosures it experiences." Id.; see also Peter Dreier et al., Haas Institute for a Fair and Inclusive Soc'y, Underwater America: How the So-Called Housing "Recovery" is Bypassing Many American Communities 6 (May 2014) (finding African Americans and Latinos are disproportionately represented in communities still struggling with foreclosure crisis).

### III. The 2020 Rule undermines enforcement of the Fair Housing Act and should be stayed. The Disparate Impact Standard has been used for decades to challenge discriminatory and abusive policies and practices that deny equal access to housing.

The Fair Housing Act prohibits discrimination in the sale, rental or financing of dwellings and other housing-related activities on the basis of race, color, religion, national origin, sex, disability or familial status.[1]  HUD has long interpreted the Act to prohibit practices that have an

---

[1] 42 U.S.C. §§ 3601 et seq.

unjustified discriminatory effect, regardless of intent, in keeping with the Act's broad remedial mandate to combat and prevent segregation and discrimination in housing, and promote integrated and inclusive communities.[2] HUD's 2013 final rule "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("2013 Rule")[3] and 2016 supplement, adopted the Act's disparate impact standard, long-recognized by the agency and federal circuit courts.

HUD's 2013 final rule is consistent with established case law and the Supreme Court's holding in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, (*Inclusive Communities*) which held that disparate impact claims are cognizable under the Fair Housing Act.[4]   The court in *Inclusive Communities* repeatedly referenced the current rule and highlighted without disagreement the rule's burden shifting framework, especially in discussing appropriate limits on disparate impact liability.[5] Subsequent decisions recognized that the Court implicitly adopted the current rule's framework.[6]

On the other hand, the 2020 Rule creates an insurmountable barrier to any consumer challenging discriminatory lending or housing practices. Instead of serving as an effective tool for combatting mortgage discrimination, the 2020 Rule would make it more difficult for victims of discrimination to bring a viable discrimination claim; undermine the well-established business necessity defense; and shield algorithmic models from challenge under the Fair Housing Act.

## A.  The pleading requirements of the 2020 Rule would make mortgage discrimination disparate impact claims virtually impossible to pursue.

---

[2] See 78 Fed. Reg. 11460, 11461 (Feb. 15, 2013).

[3] 78 Fed. Reg. 11460, (Feb. 15, 2013).  See also 81 Fed. Reg. 69012 (Oct. 5, 2016).  Collectively Disparate Impact Rule.

[4] 576 U.S. 519, 135 S. Ct. 2507 (2015).

[5] 576 U.S. at 527 and 541, 135 S. Ct. at 2514-15; 2522.

[6]  Prop. Cas. Insurers Assn. of Am. v. Carson, 13-CV-8564, 2017 WL 2653069, at *9 (N.D. Ill. June 20, 2017); Mhany Mgt., Inc. v. County of Nassau, 819 F.3d 581, 588 (2d Cir. 2016).

Under the 2013 Rule, the first step to bring a disparate impact claim is identification of a defendant's policy or practice that causes a discriminatory effect. Plaintiffs must be able to point to a specific policy or practice and prove that it is the cause of the disparate impact. Once the plaintiff has identified the policy causing the disparate impact, the burden then shifts to the defendant to prove that "the challenged practice is necessary to achieve one or more substantial, legitimate nondiscriminatory interests."[7] It is only after a defendant has successfully proven that the policy advances a legitimate business interest that the burden shifts back to the plaintiff. A plaintiff may still prevail if the plaintiff is able to demonstrate that those substantial, legitimate nondiscriminatory interests "could be served by another practice that has a less discriminatory effect."[8] As mentioned above this three-part test is not only in the current disparate impact rule but is the test that courts have used for disparate impact cases for the past four decades and the test referenced by the Supreme Court in *Inclusive Communities*.

The first step of proving that a policy is causing a discriminatory effect is often a formidable challenge for victims of mortgage discrimination because they are usually not privy to a financial institution's internal policies and procedures. Defendants may argue that no such policy exists, or that the discriminatory effect can be linked to other factors. Without discovery, it is often not possible to know what is or is not a financial institution's policy or practice or how that policy is affecting particular groups when put in action. Likewise, in most instances, it is difficult for plaintiffs to know whether other people's experiences with a financial institution are similar or different from their own.

---

[7] 24 C.F.R. § 100.500(c)(2).
[8] Id. § 100.500(c)(3).

Bringing a successful mortgage discrimination disparate impact claim often takes significant amounts of data gathering, research and analysis to identify the patterns that demonstrate that a certain policy is causing a disproportionately adverse effect on a certain group. Nevertheless, plaintiffs use the resources they have to conduct their investigations and build their case.

State and federal regulators uncover problematic practices in the course of investigating and supervising the institutions under their jurisdiction, as the Department of Justice did when it found that Wells Fargo's policies caused African Americans to be charged higher origination and broker fees for mortgages.[9] Individual plaintiffs and their advocates analyze publicly available data such as that available under the Home Mortgage Disclosure Act (HMDA) to document the disparities connected to a certain policy or practice and speak with other people in similar situations to compare experiences. In another mortgage lending discrimination case, HMDA data and borrower experiences revealed that both Latino and AfricanAmerican borrowers were being charged disproportionately higher interest rates than their white counterparts with similar credit risk because of a lender's discretionary pricing policy.[10] In other cases, plaintiffs collect data and conduct their own research to identify harmful policies. For example, a comparison of the upkeep for similarly situated bank-owned homes in white and minority neighborhoods demonstrated a disparate impact on those minority communities[11]

The three-part test is the foundation of disparate impact liability and should not be changed. The three-part test continues to provide an effective legal framework to challenge mortgage lending policies that may seem neutral but unfairly exclude certain groups of people or

---

[9] *United States vs. Wells Fargo*, No. 1:12-cv-01150 (D.D.C 2012).

[10] *Ramirez v. Greentpoint Mortgage Funding,* 268 F.R.D. 627 (N.D. Cal. 2010).

[11] *National Fair Housing Alliance v. Bank of America*, No. 1:18-cv-01919 (D. MD 2019).

isolate particular communities in practice. By bringing mortgage discrimination disparate impact claims under the Fair Housing Act within this framework, plaintiffs have been able to confront harmful, inequitable, and unjustified policies that create unnecessary barriers to housing and unfair lending practices for over 40 years. The current disparate impact rule effectively prevents plaintiffs from bringing unsubstantiated claims and defendants from escaping responsibility with hollow reasons for their policies. The three-part test is sufficiently robust and should not be changed.

HUD's 2020 Rule threatens to dismantle this critical legal tool by making it nearly impossible for mortgage discrimination plaintiffs to meet their *prima facie* burden, which will make it easier for lenders to discriminate without consequences. The 2020 Rule requires plaintiffs to allege with greater specificity a problematic policy and practice, such as identifying a single decision or a single element of a program at the beginning of a case when, as noted above, plaintiffs often have limited insight into the lending institution's decision-making process or internal practices. The 2020 Rule would require plaintiffs to plead five additional elements to prove that a specifically identifiable practice caused a discriminatory effect. Requiring plaintiffs to plead these five elements goes far beyond the Supreme Court's decision in *Inclusive Communities* and sets up virtually insurmountable barriers to challenging indirect mortgage discrimination.

The first added element is the cause for the greatest alarm. HUD's Proposed Rule would require a plaintiff to allege that "the challenged policy or practice is arbitrary, artificial and unnecessary to achieve a valid interest or legitimate objective." This element significantly raises the burden from the current rule, which only requires the plaintiff to identify a specific policy or practice that has caused a discriminatory effect. At this early stage of the process of challenging

a mortgage lending policy or practice, plaintiffs are unlikely to know what reasons or objectives the defendant will put forth to justify the policy or practice at issue to be able to address it. Under the 2020 Rule, the plaintiff would have to "allege facts sufficient to support a plausible allegation that that a policy is arbitrary, artificial, *and* unnecessary" to move forward without knowing what the defendant will say and what discovery will reveal about the reality of the defendant's policy as applied. The proposed rule would allow problematic policies that subject certain groups to indirect discrimination because they meet one of these criteria but not all three.

It is unfair to ask a plaintiff to have the kind of intimate knowledge or understanding of the defendant's business practices to credibly allege that the defendant's practice is arbitrary without the benefit of discovery. Plaintiffs cannot possibly predict all plausibly valid interests or legitimate objectives the defendant may be able to connect to the challenged policy and discredit them in order to move forward with a case. The first element of HUD's Proposed Rule assigns plaintiffs with a virtually impossible task to bring a disparate impact claim.

In addition to unbearably raising the plaintiff's burden, the first element in HUD's 2020 Rule completely shifts the defendant's current burden onto the plaintiff. Under the current disparate impact rule, it is not the plaintiff but the defendant who is required to prove that the challenged policy or practice advances a legitimate nondiscriminatory interest. HUD's 2020 Rule drastically shifts the established framework and forces plaintiffs to ponder which of the defendant's interests might be served by the policy at issue to make an argument for why the policy is arbitrary, artificial or unnecessary. Further, only if the plaintiff is able to make the case that the defendant's policy is arbitrary, artificial or unnecessary that the burden shifts to the defendant to identify the valid interests behind its policy. This burden-shifting to the plaintiff is

13

not consistent with the Supreme Court's decision in *Inclusive Communities* and unnecessarily raises the burden for disparate impact claims.

The 2020 Rule's first pleading requirement also lowers the bar for what is permissible for defendants, which will allow them to easily evade responsibility for discriminatory effects. Under the second prong of the current disparate impact rule, a policy must advance a substantial, legitimate nondiscriminatory interest. The 2020 Rule does not require proof that the policy is advancing a substantial interest but simply a valid interest or legitimate objective for the policy at issue. Neither valid interest nor legitimate objective is defined or limited in the 2020 Rule. Defendants could tie almost every policy they have to a legitimate objective since they likely had a reason for putting such a policy in place, even if the reason does not support a substantial interest.

By lowering the bar and shifting the burden onto the plaintiff for disproving the legitimacy of a defendant's policy before a case can proceed, HUD's proposed rule creates unsurmountable hurdles for plaintiffs to bring a disparate impact mortgage discrimination claim against a financial institution. It will allow defendants to easily escape liability by making it impossible for plaintiffs to challenge policies.

Even if a plaintiff is somehow able to overcome the barriers and successfully plead the first element, the 2020 Rule would require pleading four more elements before the plaintiff could move forward with the case. The second element is a robust causal link between the challenged policy and discriminatory effect. The third element is an adverse effect on members of a protected class, which is consistent with both Fair Housing Act jurisprudence and *Inclusive Communities*. The fourth element is pleading that the policy causes a significant disparity. There is no significance requirement under the current disparate impact rule, and adding such a

requirement is another hurdle for the plaintiff to overcome. Lastly, the proposed rule requires plaintiffs to prove that the plaintiff's injury was directly caused by the challenged policy or practice.

Collectively, the Proposed Rule's five elements work together to make it virtually impossible for victims of mortgage lending discrimination to bring a viable disparate impact claim and provide defendants with multiple opportunities to shield themselves from accountability for providing more expensive mortgage loans for people of color, forcing families with children to pay more money for housing, and shutting people out of housing with exclusionary zoning ordinances. The 2020 Rule undermines the Supreme Court's decision in *Inclusive Communities* and allows defendants to easily escape liability for the discriminatory effects of their harmful policies.

**B. HUD's proposed profit defense is inconsistent with well-established disparate impact jurisprudence.**

In the 2020 Rule, HUD has proposed to require plaintiffs, as part of their *prima facie* case, to state facts plausibly alleging that a challenged policy or practice is arbitrary, artificial and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit or policy consideration. HUD has further proposed to allow defendants to rebut a plaintiff's assertion by showing that the challenged policy or practice advances a valid interest and then requires the plaintiff to prove that a less discriminatory policy or practice would serve the defendant's identified interest in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant. HUD's proposals are collectively referred to as the "profit defense." However, HUD's proposals are inconsistent with well-established disparate impact jurisprudence regarding business necessity and the concept of fair lending.

15

The business necessity defense can be traced to the U.S. Supreme Court decision in *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849 (1971). As later decisions of the Court began placing a greater burden on the plaintiff concerning business necessity, Congress responded by enacting the Civil Rights Act of 1991. In the 1991 Act, Congress unequivocally states that the defendant retains the burden of proving that a challenged practice constitutes a business necessity.[12] Congress' purpose in passing the 1991 Act was to return to the principles of G*riggs v. Duke Power Co.*,[13] and *Albemarle Paper Co. v. Moody*,[14] which contained more generous standards for the plaintiff.

The 2013 Rule implementing the FHA discriminatory effects standard comports with existing case law on the burden of proof for business justification. The 2013 HUD Rule does not use the phrase "business necessity," because that language may not be easily understood in the context of government or nonprofit defendants.[15] Instead, the regulation refers to "a legally sufficient justification" that exists when a challenged practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."[16] The "substantial, legitimate, nondiscriminatory interest" standard "is equivalent to the 'business necessity' standard" and "is not to be interpreted as a more lenient standard."[17] The 2013 Rule further specifies that defendants bear the burden of proving that the practice is necessary to achieving a substantial,

---

[12] 42 U.S.C. §2000e-2(k) (1) (A).

[13] Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) (establishing that discriminatory impact violates Title VII's prohibition of employment discrimination).

[14] Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975) (setting out disparate impact analysis for prima facie case by plaintiff, defendant's burden of proving business necessity, and plaintiff's opportunity to show less discriminatory means).

[15] Final Rule, Dep't of Hous. & Urban Dev., Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460, 11,470, 11,471 (Feb. 15, 2013) ("HUD chooses not to use the phrase 'business necessity' in the rule because the phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities."

[16] Id. at 11,482, codified at 24 C.F.R. § 100.500(b).

[17] Id. at 11,470.

legitimate, and nondiscriminatory interest.[18] HUD's 2013 Rule emphasized that a challenged practice or policy interest must be *nondiscriminatory* in order to meet the legally sufficient justification standard. The 2013 HUD Rule does not need to be changed.

In a disparate impact mortgage discrimination case, the creditor carries the burden of proving not only that its business justification is the reason it acted but that its business justification is a legitimate and necessary basis to evaluate credit risks.[19] If the business justification is the real reason for the creditor's actions, but the justification is not relevant to creditworthiness, then the plaintiff's *prima facie* case of disparate impact will be sufficient for the plaintiff to prevail.[20] Business necessity should relate to creditworthiness. Creditworthiness is the core concept in fair lending.

Courts have consistently limited the legitimate  business justification defense to a lenders use of variables and practices to ascertain creditworthiness.[21] For example, in *Miller v. Countrywide Bank NA*,[22] the court rejected an argument that "market forces" justified *Countrywide's*  discriminatory pricing policy, noting that subjective criteria, unrelated to creditworthiness, should play no part in determining a potential borrower's eligibility for credit.[23]

---

[18] Id. at 11,482, codified at 24 C.F.R. § 100.500(c)(2).

[19] Congress in 1991 codified this standard for employment discrimination cases. See 42 U.S.C. § 2000e-2(e) (1) (A).

[20] See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989) (employment discrimination case); Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) (employment discrimination case). See also Town of Huntington v. Huntington Branch NAACP, 488 U.S. 15, 16, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988) (sole justification offered to rebut the prima facie housing discrimination case was inadequate); Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev., 56 F.3d 1254 (10th Cir. 1995) (mere insubstantial justification of manifest relationship is insufficient, because such a low standard would permit discrimination to be practiced through the use of spurious seemingly neutral practices); Diamond Ventures, L.L.C. v. Baruah, 699 F. Supp. 2d 57, 64 (D.D.C. 2010) (finding that defendant had not proffered "any empirical evidence" linking its specific application requirements with success of businesses receiving loans).

[21] Consumer –Lending Discrimination in the Fintech Era,  Robert Bartlett, Adair Morse, Richard Stanton , Nancy Wallace, Working Paper 25943 , June 2019.

[22] 571 F.Supp.2d 251 (D. Mass. 2008)

[23] Id @ 258.

While the pursuit of a reasonable profit is consistent with business necessity, policies or practices *unrelated to creditworthiness,* which allow creditors to extract supra-competitive revenues from protected classes of consumers merely because the creditor has the power to do so, is inconsistent with business necessity.

In the 2020 Rule, HUD has proposed to require plaintiffs attempting to challenge discriminatory effects to show that a policy or practice is arbitrary, artificial and unnecessary to achieve a valid interest or legitimate objective such as a practical business or profit consideration and would allow defendants to rebut a plaintiffs challenge to the discriminatory effects of its policies or practices by simply producing evidence showing that the policy or practice "advanced a valid interest." In essence, HUD's proposal signals to mortgage lenders nationwide that it is acceptable to pursue profits without considering the discriminatory effect it may cause to protected classes. HUD's proposed "profit defense" will lead to a discriminatory impact by encouraging mortgage lenders to create policies and practices designed to extract  supra-competitive profits from protected classes *unrelated to creditworthiness,* and immunize policies and practices that create such an unjustified discriminatory disparate impact, *but produce a profit*, from scrutiny. To say that policies or practices which generate a profit justify the discriminatory impact of those policies or practices on protected classes is antithetical to the concept of fair lending.

Additionally, HUD's proposal would encourage lenders to pursue discriminatory discretionary pricing policies. On their face, lenders' discretionary pricing policies may appear neutral and not to discriminate against protected classes. However, cases brought by advocates

and government enforcement actions have shown that these pricing policies have the effect of discriminating based upon a consumers' membership in a protected class.[24]

For example, in Allen v. Decision One Mortgage Company[25], the plaintiffs alleged that private banks and lenders maintained a policy that had a discriminatory impact on AfricanAmerican applicants because the policy allowed a discretionary surcharge of additional points and fees to an otherwise objective risk-based financing rate. In May 2010, the class members settled for $6.5 million, financial education, quarterly reporting, and loan restructuring for class members.[26] Also in Puello v. Citifinancial Services, Inc.,[27] plaintiffs alleged that Citifinancial Services and Citigroup's lending practices had a discriminatory impact on minority applicants in their home financing policies and practices. In August 2012, the parties settled with Defendants paying compensation to class members who obtained their loans through mortgage brokers, housing counseling services for class members, a non-discretionary pricing policy, training, and Class Counsel's attorney fees.[28]

HUD's proposed "profit defense" would embolden mortgage lenders to continue these type of discriminatory discretionary pricing policies that unfairly harmed protected classes and resulted in a large number of successful disparate impact cases brought against mortgage lenders

---

[24] See § 8.6.5 National Consumer Law Center, Credit Discrimination (7th ed. 2018) updated at www.nclc.org/library.

[25] 07-cv-11669 (D. Mass.)

[26] Case Profile: Allen v. One Decision Mortgage Company, Civil Rights Litigation Clearinghouse, https://www.clearinghouse.net/detail.php?id=12531&search=source%7Cgeneral%3BsearchIssues%7C390%2C284%3BsearchCauses%7C49%2C29%3Borderby%7CfilingYear%3B

[27] 08-cv-10417 (D. Mass.)

[28] Final Approval Order and Judgment, Puello v. v. Citifinancial Servs., Inc., 08-cv-10417 (D. Mass.), Aug. 10, 2012, Dkt. No. 128; see also Case Profile: Puello v. Citifinancial Services, Inc., Civil Rights Litigation Clearinghouse, https://www.clearinghouse.net/detail.php?id=12449&search=source%7Cgeneral%3BsearchIssues%7C390%2C284%3BsearchCauses%7C49%2C29%3Borderby%7CfilingYear%3B.

by private attorneys, [29] the Department of Justice and several federal agencies. [30] Thus, HUD's proposed "profit defense" is in direct conflict with forty years of disparate impact jurisprudence and must be rejected.

## IV.   Conclusion

The cascading effects of the foreclosure crisis touched every community in America. But African American and Latino communities disproportionately suffered the consequences of abusive lending practices. In light of those disparities, there remains an urgent need for effective means to address past abuses and deter future ones. For the reasons explained above, disparities in lending outcomes can be rigorously analyzed to control for legitimate factors related to a lender's business necessity. It is hard to fathom any argument in favor of insulating lenders from liability when they systematically provide credit on less favorable terms because of race in the absence of any legitimate, credit worthiness related justification. Disparate impact analysis is the principal tool for policing these abuses. To preserve that right, the implementation of the 2020 Rule should be stayed.

---

[29] See Ramirez v. GreenPoint Mortg. Funding, Inc., 268 F.R.D. 627 (N.D. Cal. 2010); Guerra v. GMAC, L.L.C., 2009 WL 449153 (E.D. Pa. Feb. 20, 2009); Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062 (S.D. Cal. 2008); Miller v. Countrywide Bank, 571 F. Supp. 2d 251 (D. Mass. 2008); Ware v. Indymac Bank, 534 F. Supp. 2d 835 (N.D. Ill. 2008); Garcia v. Countrywide Fin. Corp., No. 07-1161 (C.D. Cal. Jan. 15, 2008), available at www.nclc.org/unreported; Newman v. Apex Fin. Grp., 2008 WL 130924 (N.D. Ill. Jan. 11, 2008); Martinez v. Freedom Mortg. Team, 527 F. Supp. 2d 827 (N.D. Ill. 2007); Jackson v. Novastar Mortg., Inc., 2007 WL 4568976 (W.D. Tenn. Dec. 20, 2007). Cf. Tribett v. BNC Mortg., 2008 WL 162755 (N.D. Ill. Jan. 17, 2008) (consumer can refile complaint with more specificity).

[30] Complaint, United States v. Countrywide Fin. Corp., Countrywide Home Loans, Inc. & Countrywide Bank, No. CV-11-10540 (C.D. Cal. Dec. 21, 2011) (charging over 200,000 Hispanic and African American borrowers higher interest rates, fees, and costs for mortgage loans than non-Hispanic white borrowers and steering them into subprime loans), available at www.justice.gov; Stipulated Final Judgment & Order, Fed. Trade Comm'n v. Golden Empire Mortg., Inc., No. CV09-03227 (C.D. Cal. Sept. 24, 2010) (charging Hispanic consumers higher prices for mortgages than similarly situated non-white consumers), available at www.ftc.gov; Order to Cease & Desist, Order for Restitution, and Order to Pay, In re First Mariner Bank Balt., Md., No. FDIC-07-285b & FDIC-08-358k (Fed. Deposit Ins. Corp. Mar. 22, 2009), available at www.fdic.gov; Complaint, United States v. AIG Fed. Sav. Bank, No. 1:99-mc-09999 (D. Del. Mar. 4, 2010) (wholesale mortgage brokers charged higher fees to African American borrowers), available at www.justice.gov.

Dated: October 13, 2020                         **Respectfully Submitted,**

_____

Stuart T. Rossman, B.B.O No. 430640
Odette Williamson
Jeremiah Battle
National Consumer Law Center
7 Winthrop Square, 4th Fl.
Boston, MA 02110
(617) 542-8010
srossman@nclc.org
***Attorneys for Amicus Curiae***